[Crim. No. 890.   Third Appellate District.—July 31, 1926.]

THE PEOPLE, Respondent, v. LAWRENCE J. BENNETT, Appellant.

[1] CRIMINAL LAW—MURDER—EXAMINATION OF JURORS.—In a prosecution for murder, the defendant has the right to ask each juror if, after the case is submitted to him, he entertained a reasonable doubt of defendant's guilt, he would, notwithstanding that doubt, vote to convict him of some crime embraced within the charge in the information because some of the other jurors believed that he was guilty; whether, entertaining a reasonable doubt of the guilt of defendant, he would, nevertheless, yield to a verdict of guilty merely because he might desire to return to his home or his business, and if he believed in the law of self-defense and the law excusing upon certain prescribed conditions and circumstances the killing of a human being by another

person, and such questions do not invade the province of the trial court in the matter of charging the jury upon the law.

[2] ID. — QUALIFICATIONS OF JURORS — SCOPE OF INQUIRY. — It is of singular importance to a party whose rights are to be committed to the arbitrament of a jury that he should be convinced that those who are to compose the jury will be governed, in determining what their verdict shall be, not alone by the evidence adduced before them, but also by the law which the court may conceive is pertinent to the case and essential to an enlightened consideration of the proofs, and while a defendant will not be permitted to embark in a general exploration for the sole purpose of satisfying himself whether it will be safe to be tried by a juror against whom no legal objections can be urged, the field of inquiry in the ascertainment of whether a prospective juror is or is not free from actual or implied bias should not be so restricted as to prevent a thorough probe of the juror's mind to the end that it may thus be determined whether such juror, if selected to try the accused, would accord to him, as well as to the people, a perfectly fair trial upon the evidence and the principles of law appropriate to the case.

[3] ID.—RIGHT TO TRIAL BY IMPARTIAL JURY—SECTION 4½, ARTICLE VI, CONSTITUTION.—In the trial of a criminal case any act or action of a trial court which must necessarily have the effect of denying the accused a trial by a fair and impartial jury will not be excused or mitigated by the terms of section 4½ of article VI of the constitution.

[4] ID.—EXAMINATION OF JURORS—IMPROPER RESTRICTIONS BY TRIAL COURT—ERROR WITHOUT PREJUDICE.—In this prosecution for murder, while the trial court erred in sustaining the objections of the district attorney to the legitimate *voir dire* examination of the jurors by defendant, such errors were substantially cured where the district attorney failed to object to the same line of examination subsequently conducted by defendant, and practically the same questions were asked, were not objected to by the district attorney nor disallowed by the trial court *sua sponte*, and were answered.

[5] ID. — EXCESSIVE INDULGENCE IN INTOXICATING LIQUOR — INABILITY TO GIVE RATIONAL ACCOUNT OF OCCURRENCES TESTIFIED TO — EVIDENCE.—Testimony that witnesses called to testify to the commission of an act occurring when they had for many hours or days

2.   See 15 Cal. Jur. 425; 16 R. C. L. 280.

3.   See 8 Cal. Jur. 603.

5.   Impeaching witness by proof that he was intoxicated at the time of the occurrences concerning which he testifies, see notes in 82 Am. St. Rep. 26; 16 Ann. Cas. 370. See, also, 27 Cal. Jur. 119; 28 R. C. L. 619.

previously and were then indulging in the excessive use of intoxicating liquor is admissible as tending to show that they were so intoxicated, at and before the time the act or occurrences to which they attempted to testify took place, as to render them incapable of giving a rational or even approximately accurate account of the circumstances of the act or occurrence.

[6] ID.—WITNESSES—IMPEACHMENT — PENDENCY OF CRIMINAL CHARGE —HOPE OF LENIENCY—IMPROPER RESTRICTION OF CROSS-EXAMINATION—ABSENCE OF MISCARRIAGE OF JUSTICE.—In this prosecution for murder, while the trial court erred in restricting the cross-examination by defendant of a witness for the people which was designed to disclose a circumstance tending to show that the testimony of the witness was or might be influenced by a hope on his part that he would be leniently treated by the prosecuting officer in certain criminal charges pending against him by giving testimony which would contribute to the conviction of defendant, it cannot be held that a miscarriage of justice resulted from the ruling where the evidence of defendant's guilt was apparently conclusive and there was no substantial evidence of self-defense, nor any pretense that the accused committed the homicide while laboring under a state of insanity, and no evidence that the homicide was the result of an accident.

[7] ID. — JURIES AND JURORS — PENALTY — INSTRUCTIONS. — In such prosecution where, after retiring, the jury requested further instruction on the maximum penalty for second degree murder and were instructed by the trial judge that the statute provided imprisonment for not less than ten years, whereupon the jury retired and within ten minutes returned a verdict of guilty of murder of the second degree, the contention of defendant that the jury was misled into the belief that the maximum penalty was ten years cannot be sustained.

[8] ID. — ORDER DENYING DEFENDANT RIGHT TO CONSULT COUNSEL — ABSENCE OF PREJUDICE.—In such prosecution, although an order of the trial court, made while defendant was undergoing cross-examination, that pending a recess no one, including the attorney for defendant, should converse with defendant, was obviously wrong, the case will not be reversed on account of such order where the record fails to show affirmatively that defendant suffered any prejudice thereby.

---

(1) 16 C. J., p. 962, n. 6; 35 C. J., p. 392, n. 93, p. 396, n. 75 New. (2) 35 C. J., p. 392, n. 2, 3.    (3) 16 C. J., p. 806, n. 6; 17 C. J., p. 369, n. 8.    (4) 17 C. J., p. 291, n. 26.    (5) 40 Cyc., p. 2489, n. 1, 2.    (6) 17 C. J., p. 368, n. 5; 40 Cyc., p. 2672, n. 32.    (7) 16 C. J., p. 1088, n. 21, 28.    (8) 17 C. J., p. 274, n. 22.

APPEAL from a judgment of the Superior Court of Butte County and from an order denying a new trial. H. D. Gregory, Judge. Affirmed.

The facts are stated in the opinion of the court.

J. Oscar Goldstein for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

HART, J.—The defendant was informed against in the superior court in and for the county of Butte for the crime of murder in that he killed and murdered one Carl Bruce. The jury found him guilty of murder of the second degree. A motion for a new trial by him having been made, the same was denied by the court. He appeals from the judgment and the order denying him a new trial.

The points made for a reversal, generally stating them, are: 1. That the court erred in that it wrongfully restricted the defendant in his examination of the jurors upon their *voir dire;* 2. That error was committed in numerous instances upon the question of the admissibility of certain testimony; 3. That the court and the district attorney were guilty of misconduct which materially prejudiced defendant's case before the jury; 4. That the court erroneously instructed the jury with respect to the penalty prescribed by law for murder of the second degree, at the request of the jurors themselves, after the case had been submitted to them and they had retired for deliberation thereon.

It is conceived to be conducive to clarity in the consideration of the points first to state in a general way the facts of the case and also the substance of some of the testimony.

The homicide occurred near the hour of 3 o'clock on the afternoon of the twenty-first day of April, 1925, at the farm of one William Bennett, situated about six and a half miles from and northwest of the city of Chico. It appears that early on the morning of that date the deceased and one Wade Eades left Chico in an automobile for the ranch of Bennett, arriving there between 5 and 6 o'clock in the morning. Upon their arrival they immediately went into the Bennett house, where the defendant and his father were

asleep. They awakened the defendant, who they said they found in bed with a certain young woman, whose name need not be mentioned herein; that they finally succeeded in getting the defendant to arise, dress himself and step downstairs and induced the young woman to proceed with preparing breakfast for them. There were also present at this time a man by the name of Robert Penning and another by the name of Elwood Donaghay. Just when they arrived at the place or the reason for their being there does not clearly appear from the evidence. But that fact is of no consequence. It also appears that someone took to the Bennett place a jug of intoxicating liquor, and that the parties began drinking from said jug early in the morning and continued at intervals so to do until the homicide occurred. It also appears that during the afternoon of the day named the deceased and the defendant engaged in a quarrel and called each other opprobrious names. This quarrel was apparently about to result in a personal combat between the parties, when Eades, intervening, took hold of the defendant, threw him to the ground and held him, while the deceased started from the house and passed across the road not far distant therefrom and thence passed over a fence into a field, going some several hundred feet. Eades about this time released his hold of the defendant, who, having previously procured a club, described by some of the witnesses as being something of the size of a baseball bat, started in pursuit of the deceased and overtook him near a ditch in the field into which the deceased had fled. The defendant was seen to have raised his club and swing it once or twice. Later investigation disclosed that he had struck the deceased on the head such a blow as to have caused his death. None of the witnesses seems to have been able to state precisely the circumstances immediately connected with and preceding the delivery of the fatal blows by the defendant. None of them saw the deceased strike at or make any demonstration as if he were going to strike or assault the defendant. All of them testified that there was hardly a perceptible period of time intervening between the time when the defendant reached the deceased in the field and the time that he struck the deceased. Indeed, there is no substantial variance between the testimony of any of the witnesses, even including that of the defendant, as to the circumstances leading to the

homicide as well as those immediately attending the act of killing. The testimony of the witnesses further shows that the defendant, after knocking the deceased to the ground, started on his return toward his father's house and while so doing met two or three of the other parties. Some of the witnesses testified that he made a statement to the effect that he had killed Bruce. It was also shown that he made a demand on Eades for his (Eades') automobile and that the latter stated that he did not desire to let him have it because it might look bad as against him; that the defendant insisted on taking the automobile, stating in effect that he would take it in any event; that he did take the automobile and was driven to Chico by the young woman above referred to, and leaving the car in Chico took the train for Sacramento, where he was found by the sheriff of Butte County early the following morning with the young woman mentioned in a room in a lodging-house in said city; that the sheriff placed him under arrest and returned him to Oroville and lodged him in jail.

It appears that the defendant and the deceased had been intimate friends for a number of years and down to the time of the homicide, but the People undertook to show, and there was some testimony to that effect, that, while the defendant was away from the house and at some other part of the premises, the deceased became guilty of some insulting conduct toward the young woman; that as the defendant was returning and was approaching the point where the deceased and the young woman were he overheard the young woman accuse the deceased of having insulted her and that the difficulty between the defendant and the deceased was due to the former's resentment of the latter's act of misconduct toward the young woman.

The facts recited in the foregoing statement are gleaned from the testimony of the witnesses introduced by the People. The defendant's testimony, while in certain particulars at variance with that of the People's witnesses, nevertheless, in the main tends strongly to corroborate the testimony presented by the People and itself would seem to warrant the conclusion that the defendant not only started the trouble between him and the deceased, but, with a club in his hand, followed the deceased after he (deceased) apparently attempted in good faith to get out of the way of

further altercation or quarrel between them. The defendant's testimony was in part as follows: That on Monday, the twentieth day of April, 1925 (the day immediately preceding that upon which the homicide occurred), he and deceased were in the company of each other and together drank heavily of intoxicating liquor; that on the night of the 20th of April, he returned to his home at his father's ranch between the hours of 11 and 12, immediately going to bed upon his arrival home; that early the next morning—between the hours of 4 and 5 o'clock—the deceased and Wade Eades appeared at his father's ranch and, immediately entering the house, went to the second story where he was in bed and awakened him; that Bruce, addressing him, said: "Come on, Lawrence, and have a drink," to which the defendant demurred, answering, "I don't want one right now"; that he (defendant) thereupon "rolled over and went back to sleep, and he (deceased) woke me up again and I got up and went downstairs and into the kitchen, and he said: 'There is a bottle sitting in the water bucket; we have got some more sitting here,' and in a little while I saw Bob Penning with a gallon jug. . . . We had not had any liquor on the premises— neither my father nor I—and the gallon jug belonged to Bob Penning, who was drunk at the time." Defendant, continuing, stated that in a short time after the conversation just related all the parties (Penning, Eades, Donaghay, the deceased, the defendant, the latter's father and the young woman referred to above) sat down together to breakfast. He stated that he and all the other parties just named, with the exception of the young woman, began drinking out of the jug as early as 5 o'clock in the morning and kept it up until he went "to town" (referring to Chico), where he remained an hour (during which time he drank nothing), and then returned to the ranch and resumed drinking with the other members of the party. The importance of the testimony as to the amount of liquor drinking indulged in by the several parties during the day will be perceived when later herein we consider certain points made here by the defendant.

As above stated, the defendant left the house for a short time. It appears from his testimony that he walked up the road a short distance, intending, as he stated, "to go to town" and hoped that he might "catch a ride to town"; that, after going a short distance, he decided to return to the

house, and, as above stated, as he approached the place where the deceased and the young woman were sitting or standing, he heard the two last-named arguing. "I sat down on the road," proceeded defendant, "and didn't pay any attention to the argument—it didn't interest me—and it kind of ceased and I said, 'Honey, don't argue with him; we don't want any trouble here,' and we all went to the ranch and we still had the jug with us and got back to the ranch (he having said the quarrel between the girl and the deceased occurred a short distance from the house); and we sit in the road, Wade Eades and myself and Sharkey Bruce and Bob Penning and we had one drink right after the other and then someone started to get mad, but I don't know what it started about or I don't know what was the matter or what Sharkey Bruce said to me or what I said to him—everything then went rum-dum with me. That is all there is to it. And the next thing I remember I see Sharkey (referring to deceased) going out through the field and I just could see him and that is all and I went out to him and I said 'I will go and talk to Sharkey and ask him to come back to the ranch and make up' and I said 'I never had anything against him,' and I went out there and got pretty near to the fence where he was and he hollered 'Come on over, you s——n of a b——ch, I will fix you' and those are just his words and I got over and he made a lunge at me and I swung and I don't know if I hit him or not; he lunged again and I hit him again—I swung again and he went down and I don't know what happened after that. Q. You were pretty well intoxicated? A. Yes, I was drunk, just as drunk as I ever was in my life. Q. That is all you know what happened on that? A. I don't remember anything. Q. When you started out did you have any intention of killing your friend Karl? A. Why should I have any intention to kill a friend of mine, positively I did not."

The defendant, on being cross-examined, affected at times a lapse of memory as to the occurrences immediately preceding the homicide. This, he said, was due to the fact that he was during the entire day so far under the influence of liquor that he really did not realize what was going on. He said that he could not remember how the trouble leading to the homicide was started, and, while on one occasion he declared that he could not recall what occurred immediately

preceding the act of striking the deceased, he later stated, as he declared on his direct examination, that just before he delivered the blow with the club upon the head of the deceased, the latter made a lunge at or toward him, and that, the deceased being physically a much larger and more powerful man that he, he "just swung I guess; I don't remember." He further stated that he did not remember how, where, or when he obtained possession of the club he carried into the field when he followed the deceased. He at one time stated (cross-examination) that he had no recollection of the circumstance of Eades "holding him down," but, subsequently, in the course of his cross-examination, he was asked and answered as indicated the following questions: "Q. When Eades let you up where was Bruce? A. I don't know; he was out in the field some place. Q. Do you remember Eades letting you up? A. No, sir; not exactly the time he let me up; I don't know. Q. Do you remember of him letting you up? A. I remember him letting loose of me and I got up myself, I guess. Q. Do you remember Eades letting go of you? A. No, sir; I don't remember him letting go of me or anything about it. Q. Do you remember Eades having hold of you? A. Yes, I remember him having hold of me, yes, sir." In brief, the testimony of the defendant, elicited both on his direct and his cross-examination, was characterized throughout more or less by statements which were inconsistent with each other. In fact, his asseverations of want of memory as to some of the occurrences or events of that day which bore more or less on the fact of the tragedy were frequently contradicted by other statements made by him during the course of his testimony. In connection with the cross-examination of the defendant, however, the district attorney introduced into the record an extrajudicial statement made to the prosecutor on the twenty-third day of April, 1925—two days after the homicide was committed— in which statement the accused recited in detail the facts and circumstances connected with and leading to the tragedy. The substance of the statement is: That he (defendant), Eades, Bruce, and the young woman referred to hereinabove were together the night before the day of the homicide (defendant was not certain whether Penning was a member of the party that night); that, with the exception of the young woman, all began drinking on said night; that early

in the morning of the 21st of April, Eades, Penning, and
the deceased appeared at the ranch of the senior Bennett,
and Eades went to the sleeping room of the defendant and
awakened him, saying, "Let's get up and cook some eggs";
that thereupon defendant arose, dressed, and went down-
stairs and, as he stated, "we cooked some eggs," and about
the same time Penning "brought into the kitchen a gallon
jug of liquor." This gallon jug of liquor, defendant said,
Penning had in the house, but how it got there or who took
it to the ranch he (defendant) did not know. "We drank
until breakfast was ready," the defendant proceeded to say,
"and then he and (naming the young woman) and myself
went into town and back out again. When we got back to
the ranch we proceeded to drink more Jackass and went on
down the road. There were present there myself, Eades,
Penning, 'Sharkey' (a nickname by which deceased was
known among his intimates) and the girl. . . . She sit down
by the fence and we were drinking then and set down
a-purpose to drink and so we just got down and we had
one drink after another and I walked out to catch polly-
wogs just to be fooling around and kidding around and
when I came back Bruce (deceased) had shoved his hand
under the girl's dress and started a big rumpus with her.
She didn't like it." Defendant went on to say that he
did not witness the malodorous performance of which the
deceased was accused by the young woman, but that he
heard the latter say to deceased, "Keep your hands out from
under my dress," and heard deceased curse her in language
unfit to be repeated and make the threat that he would cut
anybody's throat that undertook to do anything to him
that he did not like; that the girl also cursed the deceased.
Proceeding, defendant said that they then "went back to
the ranch," and that he and the deceased began quarreling;
that he "went around the house," procured a club about a
yard long and returned with the club to the front of the
house where the deceased and the other parties were; that
he and deceased continued to quarrel, but that before they
came to "blows" Eades seized him (defendant), threw him
to the ground and held him there until the deceased left the
place and started in the direction of the field in which the
fatal meeting between the two men took place. After de-
ceased had proceeded a short distance into the field, the

defendant proceeded further to say, he ran after him (deceased), carrying with him the club he had picked up "around the house"; that, when he got to the fence, the defendant called the deceased, who was then about fifty yards distant from the fence, and asked him to return to the ranch; that deceased, replying, said to defendant: "You s——n of a b——ch, come on and I will fix you"; that thereupon the defendant, still carrying the club, passed over the fence and ran to where the deceased stood in the field. "Q. Weren't you·afraid of him? A. Yes, I was afraid of him all the time. . . . Q. Didn't you want to have it out with him? A. Not exactly. I knew if we got to talking we would settle it all right. What I was afraid of I knew if ever I came to town he was going to jump me again. I knew that. I was afraid of him all the time and he was one of these kind when he got drunk old memories would come back—old memories would come to Sharkey Bruce; they always did." The defendant said that, when he got to where the deceased stood, the latter made a lunge or some hostile demonstration toward him (defendant), and·he thereupon hit deceased with the club. "I hit at him once," he said, "and missed him. Q. You hit him perhaps twice? A. I hit at him once and whether I hit him or not, I don't know. A. He just kept coming at me and I hit him again. Q. Do you remember on which part of the head you hit him? A. He was coming right down there this way at me, this way, and I jumped over this way and at the same time I hit him. Q. Was it on the right or the left hand side of the head? A. No, sir; I think it was on the left hand side of the head, I believe, or near there. He just swung around like that and I jumped." Defendant was asked whether or not he knew that the club with which he struck the deceased "was a piece of a single-tree," to which he answered: "I don't know; it might have been." He stated that, after striking and knocking deceased to the ground, the latter falling into the ditch near which the assault occurred, he (defendant) started on his return to the house; that, on the way, he met Penning, Eades and the young woman going toward the spot where he left the deceased lying; that he could not state whether he did or did not say, as some of the witnesses testified that he did say when he met those parties, that he had killed Bruce. He stated that he took

Eades' car, and, first obtaining from his father the sum of seventy-five dollars, he, accompanied by the young woman, the latter driving the car, went to Chico, where he met a brother, and later had something to eat and left the automobile of Eades in Chico and then, with the young woman, took a train for Sacramento, where he was arrested by the Sheriff of Butte County at the time and place above indicated. Asked by the prosecutor whether he asked Eades for the use of his automobile to convey him from the premises, and upon the refusal of Eades to consent to his taking the car, he (defendant) said he would "take it anyway," the defendant stated that he did not remember whether such an occurrence did or did not take place. He was further asked where he intended to go and he replied, "I was going down (to Vallejo) to see my mother I suppose. Q. And from there were you figuring on going to Colorado? A. No, sir; I told the Welshes (friends in Chico where he got his meal on the evening of the homicide) that just for fun"; that his intention was, "as soon as I came to my senses, I would come back because I don't figure on beating the law. . . . Q. Do you think that the booze is the cause of the whole thing, Lawrence. A. Yes; I do because if he (deceased) had not gone to fooling with my woman I would never got riled up on booze at all. She is not my woman, but I think as much of her as I do of my life."

There are many other details contained in the extrajudicial statement of the defendant, but the substantial or important portions of said statement are sufficiently set forth in the above *résumé* thereof. It is only just to state that the defendant, at the trial, upon having his attention called by the district attorney to his extrajudicial statement, declared that certain parts thereof he had no recollection of making.

Doctors D. H. Moulton and N. T. Enloe, physicians and surgeons of Chico, conducted an autoptical examination of the deceased at the office of the coroner in Chico. The first named testified: "We found bruises on both sides of the head over the ears over the temporal region and a fracture of the skull on the right side running down the back of the ear through the parietal bone into the occipital bone and a fracture of the inner plate about two inches long which had caused the rupture of a blood vessel and fractured the

middle maxillary artery which bled into the brain tissue causing pressure and death. Q. Can you state, Doctor, what was the cause of this breaking of this artery? A. Well, it must have been a blow. Q. A blow on the head? A. Yes, sir, a blow on the head. Q. Was it a fracture of the skull on the inside? A. Yes, sir, a fracture of the skull. Q. And that fracture severed an artery? A. It did. Q. And that artery being severed caused a blot-clot on the brain? A. It did. Q. And that was the immediate cause of death? A. That was the cause of death.'' The doctor stated that there were evidences of two blows on the head, one on the right and another upon the left; that the blow on the right side of the head was the cause of death. He further stated that a party receiving such an injury as he found had been inflicted upon the head of the deceased would ordinarily not survive much beyond half an hour after the injury was received.

Doctor Enloe's testimony corresponded with that of Doctor Moulton in all vital particulars.

[1] The foregoing statement of the testimony is sufficient for our purposes herein. We will now proceed with an examination of the assignments involving the charge that the court erred in refusing to permit the attorney for the accused to propound to prospective jurors certain questions upon their *voir dire* examination, and, *in limine,* we may as well frankly express the opinion that the learned trial judge in this case confined the right of the defendant to conduct such an examination of the tentative jurors as would properly test the question of their qualifications to pass upon the important ultimate issue involved in the trial within an unreasonably narrow compass. The defendant had the right to ask each juror if, after the case was submitted to him, he entertained a reasonable doubt of the defendant's guilt, he would, notwithstanding that doubt, vote to convict him of some crime within that embraced within the charge in the information because some of the other jurors believed that he was guilty. He also had the right to ask each juror whether, entertaining a reasonable doubt of the guilt of the defendant of any offense embraced within that charged, he would, nevertheless, yield to a verdict of guilty merely because he might desire to return to his home or to his business. He also had the right to ask each juror if he believed in the law

of self-defense and the law excusing upon certain prescribed conditions and circumstances the killing of a human being by another person. (Sec. 195, Pen. Code.) These were some of the questions which the court refused to permit the defendant to ask the jurors when objection thereto was interposed, the ruling being based upon the fallacious theory that the questions invaded the province of the court in the matter of the charging of the jury upon the law. We know of no reason why it is not just as proper to ask a talesman upon his *voir dire* examination whether he would, if selected to try the case, be governed by the law and the particular rules applicable generally to all criminal cases as the same are to be stated to them in the court's charge, as it is to ask him if he would be governed, in arriving at a verdict, by the evidence brought before him. It is, of course, the exclusive function of the court to instruct the jury upon the law pertinent to the case as it is made by the evidence; and, among the legal propositions which it is the duty of the court to explain to a jury, is that they are the exclusive judges of what the evidence does or does not show. Because this is a duty of the court just as reasonably could it be said that it would be improper to ask a talesman whether he would be guided by the evidence in considering a case as it would be to say that it is improper to ask him whether he would be guided by the law as it is stated to him by the court in considering the case and arriving at a conclusion therein. That the matter of instructing a jury upon the law by the court and the question whether the jury will follow the law as thus it is submitted to them are, when considered with respect to the exercise of the right of a party to probe a juror's mind to ascertain and determine whether he can and will try the case fairly and impartially, two entirely different and distinct considerations, is a self-evident proposition. A court may charge a jury accurately respecting the law pertinent to the case, yet it does not follow therefrom that the jury will accept the court's statement of the law as correct and follow it in passing upon the issues to be decided. [2] Hence, to a party whose rights are to be committed to the arbitrament of a jury, it is always of singular importance that he should be convinced that those individuals who are to compose the jury will be governed, in determining what their verdict shall be, not

alone by the evidence adduced before them, but also by the law which the court may conceive is pertinent to the case and essential to an enlightened consideration of the proofs. It has always been held that, while a defendant in a criminal case will not be permitted to "embark in a general exploration for the sole purpose of satisfying himself whether it will be safe to be tried by a juror against whom no legal objections can be urged" (*People* v. *Hamilton,* 62 Cal. 392; *People* v. *Edwards,* 163 Cal. 752, 755 [127 Pac. 58]; *People* v. *Brittain,* 118 Cal. 409, 412 [50 Pac. 664]; *People* v. *Trask,* 7 Cal. App. 103, 105 [93 Pac. 891]), still the field of inquiry in the ascertainment of whether a prospective juror is or is not free from actual or implied bias is and should be broad. In other words, such inquiry should not be so restricted as to prevent a thorough probe of the juror's mind to the end that it may thus be satisfactorily determined whether such juror, if selected to try the accused, would accord to him, as well as to the People, a perfectly fair trial upon the evidence and the principles of law appropriate to the case. (*People* v. *Edwards, supra; People* v. *Reynolds,* 16 Cal. 129.) We are not to be understood as holding that there may not be questions involving legal propositions which may not properly be put to prospective jurors, or that in a *voir dire* examination every evidentiary phase of the case may be in detail submitted to the talesmen for their views as to how they might regard the same when considering their verdict; but the questions we are here considering—the presumption of innocence, the burden of proof, the doctrine of reasonable doubt and the principle of self-defense—involve general propositions of law which, with the exception of the right of self-defense, are applicable to all criminal cases, and whether laymen summoned to jury duty understand them and their significance as affecting the rights of an accused in the trial of his case and whether, understanding them, they will apply them in considering the evidence and in arriving at a conclusion, constitute matters of pertinent inquiry in ascertaining whether prospective jurors are in all particulars legally qualified to pass upon the question whether the defendant is guilty or not guilty, or whether there exists in their minds a reasonable doubt of his guilt. These views would seem not only to comport with the very theory upon which the sacred right of trial by jury

proceeds, but also harmonize with the general trend of the cases, of which the following from California may be named: *People* v. *Plyer,* 126 Cal. 379, 381 [58 Pac. 904]; *People* v. *Teshara,* 134 Cal. 542, 544 [66 Pac. 798]; *People* v. *Rollins,* 179 Cal. 793, 797 [179 Pac. 209]; *Kramm* v. *Stockton R. R. Co.,* 22 Cal. App. 737, 746 [136 Pac. 523]. **[3]** And it should always be remembered that, in the trial of a criminal case, any act or action of a trial court which must necessarily have the effect of denying to the accused a trial by a fair and impartial jury will not be excused or mitigated by the terms of section 4½ of article VI of the constitution. The right of trial by jury is fundamental. It is a right which was transmitted to us by the common law and as such is expressly guaranteed by the constitution, and the distinctive quality of that right—its very essence—is that every person put upon trial upon an issue involving his life or his liberty is entitled to have such issue tried by a jury consisting of unbiased and unprejudiced persons. The section of the constitution just mentioned was never intended to impair the exercise of that right, nor, indeed, to embarrass in the least the exercise of any of the fundamental rights of the People. (*People* v. *Stennett,* 51 Cal. App. 371, 395 [197 Pac. 372]; *People* v. *Wismer,* 58 Cal. App. 679, 688 [209 Pac. 259]; *People* v. *Carmichael,* 198 Cal. 534 [246 Pac. 62].) It must also be remembered that there is an obvious distinction between the matter of the procedure which the legislature has established for the exercise of the constitutional right to a trial by jury and that right itself. **[4]** But in the instant case, while, as stated, the trial court in many instances permitted the objections by the district attorney to a legitimate *voir dire* examination of the jurors to lead it into what we regard as palpably erroneous rulings, yet it transpired that to practically the same character of examination of the jurors the district attorney, probably inadvertently, as we judge from his previous objections to the same line of examination, failed to object, with the result that the errors referred to were substantially cured. As has been pointed out above, the court, when objection to such an examination was made, invariably ruled that any questions propounded to the jurors regarding the law of the case were entirely incompetent and improper; that the law of the case would be handled by the court and that the

jurors would be so instructed as to make it clear to them that it would be their duty to give the defendant the benefit of the rules of law as to which counsel for the defendant attempted to interrogate them. As seen, some of the disallowed questions referred to the law of self-defense, excusable homicide, the doctrine of reasonable doubt, etc. As stated, though, practically the same questions were asked, were not objected to by the district attorney or disallowed by the court *sua sponte* and were answered. Thus each of the jurors examined was asked and answered these questions: Whether he (we will refer to the women as well as the male talesmen) had any opinion as to the guilt or innocence of the accused; whether he would give defendant a fair and impartial trial according to the evidence viewed by the light of the law as given to him by the court; whether he would follow the law as the court gave it to him; whether he had any bias or prejudice against the law of self-defense or the law regarding excusable and "accidental" homicide; whether he would accept the law of the case from the court, even though the law as so stated did not coincide with his notion or view of the law; whether the fact that the defendant was charged with the crime of murder would prejudice or bias him against the accused "in any way, shape or form at any time throughout the trial of the case"; whether (in response to the district attorney) he knew of any reason whatever that would prevent him from serving as a fair and impartial juror "in this case if you are selected"; whether he would give both sides a fair trial; whether he had talked with any person claiming to be familiar with the facts, particularly with or to members of the coroner's jury that inquired into the cause of the death of the deceased, about the case. Lastly, defendant's counsel was permitted to ask each juror this question: "If you were on trial upon this charge would you be perfectly satisfied and willing to have a juror sit where you are now sitting with the frame of mind and your attitude generally towards defendant and your knowledge of the facts of the case and try you upon this charge?" Of course, the *desideratum* of a *voir dire* examination of talesmen is to secure a jury composed of persons who can and will act in the trial of the case with entire impartiality as between the contending parties. (*People* v. *Reynolds, supra.*) It seems plain to us that the last indicated examination of the

tentative jurors in this case was sufficiently scopeful to secure such an exposure of the state of their minds with respect to the case as to have facilitated an ascertainment with reasonable certainty whether they could and would try the case with perfect fairness and entire impartiality. Manifestly, nothing more or further by the way of a *voir dire* examination can legally or reasonably be asked.

[5] The next assignments, as seen, relate to rulings on evidence. There are many of these assignments. A general reference herein to a number relating to the same subject matter will be sufficient. On cross-examination of the witnesses Penning, Eades, and Donaghay, who, as shown, testified on behalf of the People, the defendant's counsel undertook to bring out from each the fact that all of the parties, including the defendant and the deceased, began drinking liquor together the night before the day of the homicide, that they resumed such drinking at an early hour of the morning following and kept it up incessantly to the time the deceased was struck and killed. To many of the questions asked along those lines the district attorney interposed objections which the court sustained, the ground of the rulings being, as the court explained, that any testimony showing that said parties indulged in liquor either the night before or several hours preceding the act of killing on the day thereof, was too remote from said act. The court further explained that such testimony would be inadmissible unless the drinking was shown to have taken place near the precise time of the homicide. The object of the cross-examination was, obviously, to show that the witnesses present when the homicide and the events leading thereto occurred, had been and were under a state of inebriety to such an extent that they were practically oblivious to everything that was going on at the Bennett ranch that day, or, in other words, were not mentally capable of giving a correct account of the facts and circumstances preceding and attending the act of killing. For this purpose the cross-examination was perfectly proper. It requires no expert to confirm the proposition that the power of perception and of memory of one who keeps himself charged to full capacity with intoxicating liquor, particularly that of the "jackass" variety, for several successive days or many consecutive hours, will, as a general rule, become impaired or so weakened that any statement

that such person might make as to happenings going on about him while in such a condition would be wholly undependable. Therefore, testimony that witnesses called to testify to the commission of an act occurring when they had been for many hours or days previously and were then indulging in the excessive use of intoxicating liquor, is admissible as tending to show that they were so intoxicated at and before the time the act or occurrences to which they attempted to testify took place as to render them incapable of giving a rational or even an approximately accurate account of the circumstances of the act or occurrences. Indeed, even testimony that witnesses called to prove the fact in dispute were in an intoxicated condition immediately after it occurred, would be competent for that purpose. In the present case, however, as will be seen from the above statement of the testimony, the fact of the intoxication of the witnesses named was sufficiently shown, the district attorney, for some reason, failing to object in those instances where such testimony was received. In fact, the district attorney himself proved the fact by introducing in evidence, and thus standing sponsor for the verity thereof, the accused's extrajudicial statement, in the course of which the defendant a number of times declared that he and the other witnesses above named had been drinking heavily for some time prior to and down to the time of the tragedy.

[6] The next assignment under this head arose as follows: Against the prosecution's witness, Penning, there had previously been filed and were pending in the superior court of Butte county, at the time the instant case was called for trial, two criminal charges based, respectively, upon the sale and upon the possession of intoxicating liquor. Counsel for the defendant sought to bring out by the cross-examination of said witness that such charges were pending against him, and that one had been set for trial for a date some two weeks prior to the date fixed for the trial of the present case, but was postponed, on motion of the district attorney, to a date two weeks subsequent to the date fixed for the trial of the instant case. An objection by the district attorney to this proposed cross-examination was sustained by the court. The cross-examination, as the attorney explained, was designed to disclose a circumstance tending to show that the testimony of Penning for the People was

or might be influenced by a hope on his part that he would or might be leniently treated by the prosecuting officers in the criminal case or cases pending against him by giving testimony which would contribute to the conviction of the defendant. We think the proposed inquiry involved a proper subject of cross-examination for the reasons stated by the supreme court as follows, in *People* v. *Dillwood,* 4 Cal. Unrep. 974 [39 Pac. 438], and that the defendant would be entitled to prove the fact by the record if the witness denied it: "It is competent to show the fact that other criminal charges are pending in the same court against the witness at the time he testifies, not, however, as evidence of particular wrongful acts, for as to these he is presumed to be innocent, but as a circumstance tending to show that his testimony is or may be influenced by a desire to seek the favor or leniency of the court and prosecuting officers by aiding in the conviction of the defendant." (See, also, *People* v. *Thomson,* 92 Cal. 506, 509 [28 Pac. 589]; *People* v. *Hoffman,* 195 Cal. 295 [232 Pac. 974].) Such testimony goes to the question of the credibility of the witness. The evidence in this case, however, is apparently conclusive of the defendant's guilt, and it would, indeed, involve a plain repudiation of the terms and the spirit of section $4\frac{1}{2}$ of article VI of the constitution to hold that a miscarriage of justice resulted from the ruling. There is here no substantial evidence of self-defense, nor any pretense that the accused committed the homicide while laboring under a state of insanity, and certainly no evidence that the homicide was the result of an accident. About all that could reasonably be claimed under the evidence is that there was in the act of killing no malice or a deliberate purpose to take life, and the jury gave the defendant the benefit of that view of the evidence.

The assignment of misconduct on the part of the court and the district attorney during the trial of the cause does not require extended notice. As is nearly always true, where a trial is closely contested, attorneys often make remarks which are not warranted, and which, therefore, should not be made. In this case, we cannot say that the district attorney's alleged misconduct was of so grievous a nature as to compel a reversal, although it is to be granted that he occasionally made statements that should have been left

unsaid. The same may be said of the like charge against the court, although it is to be conceded that the latter, in ruling upon objections urged by the district attorney, was sometimes unreasonably severe and as often unjust in his criticism of the defendant's attorney when the latter sought to make proof of certain facts which the district attorney and the court conceived were not proper to be brought into the case. The defendant's counsel, as the record appears to show, was noticeably courteous to the court on all occasions during the trial, and in a number of instances in which the court's language in addressing the attorney seemed to involve a reprimand, the latter's position was legally sound. But too strong a case of guilt was established to justify the conclusion that the alleged misconduct of the prosecutor and the court had the effect of frustrating the ends of justice herein.

[7] The next point which should be given attention is founded upon the circumstance that, after the case had been submitted to the jury, the latter requested that they be returned into court for the purpose of receiving further instructions on the law, whereupon the judge, the district attorney, the attorney for defendant, the court reporter and the sheriff stepped to the door of the jury-room and the judge asked the jurors what further instructions they desired. The foreman, in reply, stated that they wanted to know what the maximum penalty for second degree murder and the maximum penalty for manslaughter were. The judge, in effect, stated to them that he was not at liberty to answer those questions, and then, addressing the attorneys asked them what they desired him to do respecting the matter. Both the district attorney and the defendant's counsel expressly stated that they had no objection to the judge enlightening the jurors upon the matter to which their questions related, and thereupon the judge, addressing the jury, explained that, as to the penalty for second degree murder, the statute merely provides that it shall be imprisonment in the state prison for a term of not less than ten years and that for manslaughter the penalty is imprisonment in the state prison for a term not exceeding ten years. Counsel for the accused now argues that the form in which the judge stated the penalty for second degree murder was misleading and prejudicial to his client, in that, as

indicated by the fact that, within ten minutes after the judge so stated the penalty for that degree of murder, they returned a verdict of guilty of. murder of the second degree, the jurors "unquestionably" got the impression that the maximum penalty for second degree murder was ten years. We think the contention is untenable. The necessary assumption of counsel's argument is that the jury were disposed to find the accused guilty of that offense only for which a maximum punishment of ten years is prescribed. That assumption, though, is plainly negatived by the consideration that the judge explicitly explained to the jury that the term of ten years constituted the maximum penalty for manslaughter, so that had the jury desired that the defendant should not be subjected to a penalty in excess of ten years of imprisonment, they certainly would have found the accused guilty of manslaughter. The judge, however, stated the penalty for second degree murder precisely in the language of the statute, and it is quite clear that his statement thereof was sufficiently explicit to convey to any intelligent mind that the law specifically prescribed for that degree of murder the minimum penalty only, and, having so fixed it, it was entirely in the discretion of the prison board to make the maximum penalty therefor in any given case either at the fixed minimum penalty or a penalty consisting of any number of years between said minimum and life imprisonment or life imprisonment itself, or what would amount to the same thing. We, therefore, do not think that the jury could have been or were misled by the manner in which the judge gave the information regarding the penalties as to which they requested enlightenment, or that the episode, which, perhaps, should not have taken place, in any degree prejudiced the rights of the accused.

[8] What might have been a most serious error, complained of herein, results from an order made by the court, while the defendant, in the witness chair, was undergoing cross-examination by the district attorney, to the effect that, pending the recess of the court from the adjournment time of a certain day until the hour for the reconvening of the court the following day, no one should be permitted to converse with or talk to the accused, who, at all times during the trial, was in the custody of the sheriff. The court stated that the order would include the attorney for the defendant.

The order was so obviously wrong that it is surprising that it should have been made. We do not know of any proposition better or more thoroughly settled in this country than that it is not within the power or province of any court of justice to make an order which, if executed, would prevent a defendant in a criminal case from consulting with his counsel at any time, either before or during the progress of the trial. But the record here fails affirmatively to show that the defendant suffered any prejudice from the order so made. It is not made to appear that counsel for the defendant was prevented from personally interviewing or conversing with his client during the period of time covered by the order. In fact, the defendant made no showing that his attorney did not have full opportunity to converse and consult with him at all times and to an extent that would enable him to present such a full and complete defense as was available to him. The case, therefore, should not be reversed because of the void order referred to.

Lastly, it is to be remarked that the charge of the court was free from prejudicial error and on the whole stated the law applicable to the facts fully, clearly, and correctly. The principles of law declared in the instructions preferred by defendant and disallowed by the court were substantially covered by the court's charge.

The judgment and the order are affirmed.

Finch, P. J., and Plummer, J., concurred.