[Crim. No. 5436.   Second Dist., Div. One.   Feb. 27, 1956.]

THE PEOPLE, Respondent, v. GEORGE W. REDSTON, Appellant.

Aaron Sapiro and Sam Bubrick for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, and Victor Griffith, Deputy Attorney General, for Respondent.

FOURT, J.—Defendant was charged in an information with the commission of two felonies: count I, a violation of section 187 of the Penal Code, in that on December 25, 1954, he murdered Louis Carl Roeckle, and count II, a violation of section 245 of the Penal Code, in that on December 25, 1954, he committed an assault with a deadly weapon upon Victor J. Dignazio. Defendant was further charged with a prior conviction of a felony, namely murder in the state of Texas on September 25, 1936.

Defendant admitted the prior conviction and pleaded not guilty, and not guilty by reason of insanity, to each of the counts.

Trial was by jury and the defendant was found guilty of manslaughter as to count I. The jury disagreed as to count

II, and that count was thereafter dismissed upon motion of the district attorney. The defendant withdrew his plea of not guilty by reason of insanity, made a motion for probation and for a new trial, each of such motions was denied and he was thereupon sentenced to the state prison. The defendant has appealed from the judgment and from the order denying his motion for a new trial.

On December 24, 1954, and for several years prior thereto, the defendant was acting as a bartender in the Pecon Club on South La Brea Avenue in the city of Los Angeles. Victor Dignazio was a steel worker who, with some fellow employees, had done a great deal of drinking just before going to the defendant's place of business about 3 p. m., December 24, 1954. Dignazio was a frequenter of the bar in question. He was in the bar substantially all of the time after his arrival until about 1 :30 o'clock a. m., December 25, 1954, and during most of this time he was ordering and consuming drinks.

At about 6 p. m., Dignazio was talking with one Larry Sampson at the bar, and apparently the defendant ordered Sampson to leave the establishment because of his bad conduct and intoxication. Dignazio and the defendant thereupon had some discussion with reference to that episode, wherein Dignazio indicated that it was unfair to Sampson to order him to leave. Dignazio continued to consume drinks to the point where he was finally refused any further drinks.

Later in the evening, John Wise, Richard Sayer and Louis Roeckle were in the bar. Sayer had a drink with Dignazio. The defendant told Sayer that Dignazio and Roeckle had been agitating him and he further told Dignazio to leave the establishment. Dignazio stated that he had been having an argument with the defendant about communism. The defendant maintained a large sign, among others over the bar, reading "Fight Communism," and Dignazio had expressed disapproval of the idea. The defendant again told Dignazio to leave the place of business and came around the end of the bar for the purpose of turning out the lights, to the end that everyone would go home. Upon the defendant's coming from behind the bar, Dignazio grabbed him by the head in a headlock. Sayer pulled Dignazio off of the defendant, whereupon the defendant ran back behind the bar with Dignazio pursuing him. Defendant was afraid of Dignazio and fearful that he would be badly injured by him. Dignazio had frequently talked of his great strength, had threatened the defendant during the evening, had told him that he would smash him

like a grape and that he would break his arm like a match.

Upon Dignazio's continuing to come behind the bar, defendant grabbed a bat which was used as an ice tamper and struck Dignazio on the top of the head, cutting his scalp. There was blood behind the bar at a point about three feet from the open end. The testimony is conflicting as to how Roeckle got hit. Some evidence is to the effect that while the defendant was fighting off Dignazio, Roeckle, who was on the front side of the bar, reached across the bar, grabbed the defendant and that thereupon, the defendant, from behind the bar, struck Roeckle with the bat; that Roeckle had a large ashtray in one of his hands at the time; that it was thought that the defendant hit Roeckle only once, but that after the defendant came from behind the bar Roeckle was trying to come at the defendant, and that defendant may have hit him the second time. Other testimony is to the effect that after felling Dignazio behind the bar, defendant came to the front of the bar and struck Roeckle on the head several times; that the defendant then went behind the bar and hit Dignazio again, and thereafter returned to Roeckle and hit him again while he was lying on the barroom floor.

During the melee Wise and Sayer ran outside. Officers Brown and Ward of the Los Angeles Police Department met Wise and a Mr. Bowes, and after talking with them, entered the bar. Prior to the officers' arriving, Sayer had returned to the bar and lifted and carried Roeckle some 200 feet outside of the building. Sayer intended to take Roeckle to an emergency facility for medical attention. Dignazio had, in the meantime, gotten up, walked out of the establishment, and he later went to a doctor and hospital for treatment.

The defendant was excited and confused when questioned by the officers in the first instance, and at that time he told several untruths. Defendant denied any trouble at the bar. He stated that there had been some trouble earlier, but that the men had left; that there had been an argument between some men, but no real fight. When asked if he had hit anyone with a bat he replied that he had not, that there was no bat in the place. The bat was later located by one of the officers and inquiry was made about a red smear on it, and a smear on defendant's torn shirt. Defendant stated that the smears were red paint. Roeckle was located by one of the officers in an unconscious condition at the point where he had been taken by Sayer. Defendant, upon being confronted with this,

thereupon admitted that there had been a fight, and that he had struck the two men who had attacked him.

Defendant was arrested and taken to the police station and questioned at about 2:30 o'clock a. m., December 25th, by Officers Danforth and Jackson. Sayer was also arrested and taken to the same police station. Roeckle was taken to a hospital and died on December 27, 1954, after an operation on his skull.

At the police station, at about 2:30 a. m., December 25th, a statement was taken from the defendant which was tape recorded without his knowledge. Later, following the death of Roeckle, another statement was taken from the defendant, which was also tape recorded without his knowledge, and still later a third statement was taken, but not tape recorded.

An autopsy surgeon testified that the death of Roeckle was due to a fractured skull; that he was unable to say whether the deceased received one blow or multiple blows.

The defendant contends that the trial court erred in receiving into evidence as People's Exhibit 1, a picture of Roeckle apparently taken during the course of the autopsy. The picture is of the deceased with the hair shaved off and showing certain incisions on the head, neck and chest, apparently made during the autopsy. This picture was followed by two others. People's Exhibit Number 2 was a picture of the upper part of the skull, after the same had been removed with an electric saw. One piece of bone was missing which had apparently been lost in the course of the autopsy or thereafter. People's Exhibit Number 3 was a picture of the base of the skull after the top had been sawed off and removed. The pictures are ghastly and gruesome. There was never any question as to the identity of the deceased and there was no question as to the death. ▉ The general rule is that, "Where the inevitable effect of introducing a photograph is to arouse the sympathy or prejudice of the jury, and the fact in proof of which it is offered is not denied, or where its introduction serves no purpose other than to inflame the jurors' emotions, it is not admissible." (18 Cal.Jur.2d 710.) In the case of *People* v. *Burns*, 109 Cal.App.2d 524 [241 P.2d 308, 242 P.2d 9], the court said, with reference to some pictures of the deceased, at pages 541-542: "They were particularly horrible because the head was completely shaved. The head shows large incisions which had been made for the autopsy and were thereafter sewn together. . . . Bruises and abrasions appear on the face, neck and arms. . . . No one

disputed that the deceased received them. . . . How looking at the pictures would help the jury understand what caused them or how they could cause death, it is difficult to understand. The completely bald head, the surgical cuts and sutures, the ugly punctures, the inverted lips with the instruments attached, make the body so grotesque and horrible that it is doubtful if the average juror could be persuaded to look at the pictures while the witness pointed out the bruises and abrasions. In view of the fact that no question was raised as to these bruises and abrasions, and the fact that a view of them was of no particular value to the jury, it is obvious that the only purpose of exhibiting them was to inflame the jury's emotions against defendant. . . . In California it has been held that photographs of this kind are admissible even though they show marks of the incisions for the autopsy (*People* v. *Gomez*, 209 Cal. 296 [286 P. 998]), and even though they might inflame the minds of the jurors against the defendant. (*People* v. *Burkhart*, 211 Cal. 726 [297 P. 11].) However, in every case in which they were admitted (with the possible exception of the Burkhart case, *supra*, where the 'evidence points positively and unmistakably to the defendant as the perpetrator of the homicide' (p. 730)), there was some necessity for exhibiting the wound or wounds to the jury. In *People* v. *Elmore*, 167 Cal. 205, 212 [138 P. 989], the court pointed out that photographs should not be offered or admitted for any purpose other than to help the jury. The admission of photographs of this type is within the sound discretion of the trial court. Surely, there is a line between admitting a photograph which is of some help to the jury in solving the facts of the case and one which is of no value other than to inflame the minds of the jurors. That line was crossed in this case. The error was not waived by the fact that after the court had admitted the photographs and the district attorney asked the doctor to point out on them the injuries shown thereon, defendant objected on the ground that the photographs speak for themselves. There was an abuse of discretion here.''

Under the circumstances in this case, it was error to admit the photograph of the deceased in his then condition.

John Wise and Richard Sayer, who had testified at the preliminary hearing on January 21, 1955, supposedly could not be found on March 18, 1955, the date the trial was set, or on March 21st, the date upon which the trial actually

started. The court permitted the testimony given by them upon the direct examinations at the preliminary hearing to be read to the jury. Permission was refused to introduce the testimony of Charles Arak and Charles Cane to impeach the statements made by Sayer and Wise at the preliminary hearing. Permission was also refused to introduce testimony with reference to the circumstances under which Sayer made his statement to Charles Arak. Further,the court refused the defendant the right to explain why he had told the untruths to the officers in the first instance.

Appellant contends that the trial court erred in receiving the testimony of Richard Sayer and John Wise as given at the preliminary hearing.

Wise testified at the preliminary hearing as to his residence and occupation, that he had no home address; that he lived at the Wilshire-La Brea Bowl, 737 South La Brea, and that he was a janitor at the establishment.

Sayer testified at the preliminary hearing that he lived at 3501 West 8th Street, and that he worked at Tilford's Restaurant.

The district attorney, for the purpose of laying a foundation to show due diligence for the reading of the testimony at the preliminary hearing, called three witnesses. Anthony Coia, a process server for the district attorney, received a subpoena on February 17, 1955. Several persons were named in the subpoena, among them C. A. Bowes, Richard Sayer (whose address on the subpoena showed Tilford's Restaurant, Wilshire and La Brea—3501 W. 8th Street (5301 W. 8th)), and John Wise (whose address on the subpoena showed Wilshire-La Brea Bowl, 737 S. La Brea YO 5296 Janitor). Charles A. Bowes testified that he was in charge of the maintenance of the bowling alley two doors away from the Pecon Club; that he knew Sayer and Wise and that he saw them December 25th, 1954. He further testified that he did not know where they were now and that the last time he saw Sayer was the night of the episode, and that he didn't remember when he last saw Wise. Coia testified that he went to a bowling alley at 737 South La Brea where he talked to a C. A. Bowes who told him that Wise, two weeks previously, was on his way to Big Bear, enroute to San Francisco. The witness then testified that he proceeded to an apartment house about one hundred feet from the bowling alley and talked to the manager. Coia said he inquired concerning Wise and Sayer and learned that they were no longer residing at the

apartment house. He stated that he checked the county and city jails and learned that the persons being sought were not in either jail. He said the registrar of voters could not give him any information as to their whereabouts. He stated further that he called about six various bowling alleys, without saying where they were, in the hope that maybe the persons sought might be employed at another bowling alley, and found that they were not employed at any alley that he had called.

A foreign subpoena was issued on March 15, 1955, three days before the case was set for trial. This subpoena set forth, in substance, that the address of Wise was Baldwin (or Windsor) Bowling Alley, 624 Mission Blvd., San Francisco, California. It further set forth, in substance, that Richard Sayer (a k a Richard Wm. Mc Fadden) was at the same address as Wise. Officer E. V. Jackson of the Los Angeles Police Department testified that at the request of the deputy district attorney, he made an effort to locate Wise and Sayer; that he directed an all-points bulletin over the teletype system statewide, regarding Sayer, requesting any information as to his whereabouts. As to Wise, he directed a teletype to the chief of police in San Francisco and requested that he conduct an investigation in the bowling alleys in the 700 block on Mission Street. A letter from the chief of police returning the subpoena unserved, set forth that there is no such address as 624 Mission Boulevard in San Francisco. The witness also testified that he inquired of the State C.I.I. of Sacramento (which we presume is the Bureau of Criminal Identification and Investigation) regarding Sayer and was advised that they had no information "on him." The deputy district attorney, with that showing, asked for and received permission, over the objection of the defendant, to read the testimony of Wise and Sayer taken at the preliminary hearing held on January 21, 1955. After the direct examination testimony of Wise and Sayer at the preliminary hearing had been read to the jury, the trial judge apparently, for the first time, looked at the transcript. There was no affirmative showing prior to the reading of the testimony that it had ever been transcribed by the reporter, certified by him or filed with the county clerk. ■ In other words, there was no showing whatsoever of the authenticity of the transcript before it was read to the jury. However, there was no specific objection on that ground and unless the record clearly shows error, no presumption will be indulged that error was committed.

494

In the laying of the foundation for the introduction of the testimony of Wise and Sayer, neither the process server nor the policeman testified that he had checked for any forwarding addresses at the post office, or otherwise. There was no testimony that any check had been made at Big Bear for Wise, where he supposedly had gone. There was no testimony that any check for Sayer was made at the place where Sayer said he was employed. There was no testimony that the federal, state or private employment agencies or labor unions were checked. There was no testimony of any check of any hospitals or similar institutions. There was no testimony of any check of the telephone, light, gas and water companies, or of the local directories. There was no testimony by Officer Jackson that in issuing the teletype or in his inquiry of the State C.I.I., he ever sought information concerning Richard McFadden, the name Richard Sayer was apparently "also known as." To say that a witness has not been found is not the same as swearing that he cannot, with due diligence, be found within the state. The word "diligence" connotes persevering application, untiring efforts in good earnest. There must be evidence of a substantial character to support the conclusion of due diligence. Here there was no showing that there was a thorough, painstaking and systematic effort to locate the witnesses. As was said in *People* v. *McDonald*, 66 Cal.App.2d 504, at page 509 [152 P.2d 448], "The provisions of section 686 of the Penal Code, whereby the testimony taken at the preliminary examination may be read into evidence at the trial, upon its being satisfactorily shown that the witness cannot with due diligence be found within the state, contemplates something more than a desultory and indifferent search for a witness. The admission of complainant's testimony taken at the preliminary hearing, upon a foundation which shows only lack of diligence, constitutes an abuse of discretion on the part of the trial court, which under the circumstances must be held prejudicial. It is unnecessary to consider the other points raised." Due diligence is foundational and must be complied with before the testimony is admissible. It follows from what has been set forth herein that there was not "due diligence" as contemplated by section 686 of the Penal Code.

Defendant correctly contends that his right to cross-examine the witness at the time of the preliminary examination was

erroneously restricted and curtailed. It was not a full and complete cross-examination.

At the preliminary examination, counsel for the defendant started to cross-examine Sayer with reference to a contradictory statement that he, Sayer, had made to Mr. Sapiro and Mr. Arak, the attorneys for the defendant, when Sayer was in custody in jail on December 28, 1954. Questions were directed to the witness Sayer to ascertain if he would consent to the attorneys taking the witness stand and testifying as to what the witness had previously told them. There was an objection to that line of examination by the prosecution which was sustained by the court. ██ The deputy district attorney thereupon advised the witness that he was not required to give any answers to any questions by counsel which might tend to incriminate him of any crime whatsoever, or tend to degrade him, and further, that he could decline to answer any questions *which he felt, in his own mind,* might tend to incriminate him of any crime.

It is doubtful that there could be a statement more stultifying than this to the laws of evidence. The privilege against self-incrimination is a highly technical subject. ██ The deputy district attorney knew, or should have known, that the witness was not the judge of the tendency of an answer to incriminate. That was for the court to determine. ██ It is not only a legal requirement, but an element of good citizenship for an individual called before a court to testify to answer questions honestly and frankly. The witness stated that he was unwilling that the attorneys testify as to what was said between the witness and the defendant's attorneys at the time of their conversation. When further inquiry was attempted by counsel to ascertain why the witness was unwilling, the deputy district attorney immediately started to advise the witness of a further privilege. Counsel for the defendant stated, "May I object to counsel (the deputy district attorney) putting words in the mouth of the witness? I think the witness should testify for himself. I think it is a pretty rotten thing that the State should try to gag testimony and prevent proper testimony from coming before a court in a case as important as this where a crime of this nature is involved." The judge then stated that the deputy district attorney could proceed to advise his witness and the deputy thereupon informed the witness that the communications between attorney and client were priviliged and

that such could not be divulged without the consent of the client. The question was then put to the witness as to whether he had ever retained an attorney while in the jail. The answer was "No."

It is apparent that insofar as the testimony of Sayer is concerned, the deputy district attorney prevented any semblance of a proper and thorough cross-examination of the witness. Mr. Justice Sutherland stated appropriately in *Berger* v. *United States,* 295 U.S. 78, 88 [55 S.Ct. 629, 79 L.Ed. 1314], the following: "The [District Attorney] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one."

No injustice is done to the prosecution to rule that before it can avail itself of the evidence taken at a preliminary hearing, the truth of such testimony shall be subjected to such tests as experience has shown necessary to render reliance thereon at all safe. Where this has been prevented without fault of the defendant, the evidence should be excluded.

At the conclusion of the prosecution's case, the defendant offered to establish, by a witness Cane, that on January 8, 1955, Cane saw Wise at the Pecon Club; that he asked Wise what he knew about the trouble the defendant was in; that Wise stated, in effect, that he had not seen anything; that he was playing the juke box and did not see any trouble. The defendant apparently knew nothing of this conversation between Cane and Wise until long after the preliminary examination. There was an objection and the court sustained the same. In the case of *People* v. *Collup,* 27 Cal.2d 829, 836-838, 839 [167 P.2d 714], it was said: "The reading of the former testimony is expressly permitted by the code (Pen. Code, § 686; Code Civ. Proc., § 1870(8)), and the goal of all judicial proceedings is to bring before

the trier of fact all pertinent evidence. Hence the rule allowing the use of former testimony is a salutary expedient in the administration of justice. But it is equally clear that by reason of the same principle the impeaching evidence should be admitted for what it is worth. It is also evidence which throws additional light upon the case.

"The reason for the requirement that a foundation be laid is in furtherance of that policy. To prevent the surprise of the party offering the witness, that is, to give him data from which his witness may refute or explain the impeachment, and to present the complete picture of the credibility of the witness by preserving the opportunity to explain or refute, and the danger of false testimony by the impeacher are valid reasons for the rule. With reference to surprise, the prosecution should bear that burden when they take advantage of the unavailability of the witness as a basis for introducing the testimony at a former hearing. Insofar as the reasons for the rule consist of the endeavor to get all of the pertinent evidence before the court and to further test the credibility of the impeachment, the lack of the foundation cannot be said to impair the value of the impeaching testimony to the point where it should be rejected when it is impossible to lay the foundation.

"Closely analogous to the question here presented, is the rule declaring admissible, contradictory statements to impeach dying declarations. The only difference of consequence is that the offeror of the impeaching evidence had no opportunity to cross-examine the declarant. There is, however, the right of cross-examining the witness to the declaration, and like in the case at bar, the declarant-witness is unavailable, making the laying of a foundation impossible. The same principles should be applicable in both cases. Dying declarations may be impeached by contradictory statements of the deceased without laying a foundation. (*People* v. *Amaya,* 134 Cal. 531 [66 P. 794] ; *People* v. *Lawrence,* 21 Cal. 368 ; *People* v. *Attema,* 75 Cal.App. 642 [243 P. 461] ; *Carver* v. *United States,* 164 U.S. 694 [17 S.Ct. 228, 41 L.Ed. 602] ; 16 A.L.R. 419; III Wigmore on Evidence (3d ed.), § 1033.) It has been held that there is a distinction between impeaching dying declarations and testimony at a former trial because of the opportunity to cross-examine in the latter case (*Mattox* v. *United States,* 156 U.S. 237 [15 S.Ct. 337, 39 L.Ed. 409]), but as we have seen the issue is largely one of the value of the evidence, and that factor should not be decisive.

The Mattox case was by a divided court, and Justice Shiras, dissenting, in discussing the question, stated: 'Undoubtedly, the credit of witnesses testifying under oath should not be assailed by evidence of their statements made elsewhere, without affording them, if practicable, in justice to them and to the party calling them, an opportunity to deny, explain, or admit; but it must not be overlooked that the primary object of the trial is not to vindicate the truth or consistency of witnesses, but to determine the guilt or innocence of the accused. If the evidence tending to show that the testimony of an essential witness cannot be relied on, because he has made contradictory statements elsewhere and at other times, is valid and admissible, as the authorities all concede, why should the right to put in such evidence be destroyed by the incidental fact that the witness, by reason of death, cannot be produced to deny or to admit that he made such statements? Does not the necessity call for a relaxation of the rule in such a case?' In *Carver* v. *United States, supra,* the court permitted the impeachment in the case of dying declarations and cited the Mattox case, but stated, at page 698: 'We are not inclined to *extend* it to the case of a dying declaration. . . .' The opportunity to cross-examine is not of too great significance when we have a case where the contradictory statements were made after the former testimony or were not known to the impeacher at the time. In such case he never had an opportunity for cross-examination to test the witnesses' reliability on that ground.

"The modern tendency is to relax rigid rules of evidence —to escape from a slavish adherence to them with the accompanying hardship, injustice and prevention of a full disclosure of all pertinent circumstances to the trier of fact. Dean Hale, of the School of Law of the University of Southern California, aptly states: 'However, it doubtless is possible to follow this rule, calling for foundation, too slavishly. Cases arise in which the laying of the foundation is impossible or impracticable—for example, where a deposition is taken and the conflicting statements are made thereafter, or where the declarant of admissible hearsay has told conflicting stories.' (10 So.Cal.L.Rev. 136.) We conclude therefore that no predicate was necessary for the impeaching evidence in the instant case.

"Insofar as those cases [*People* v. *Witty*, 138 Cal. 576 (72 P. 177); *People* v. *Compton*, 132 Cal. 484 (64 P. 849);

*People* v. *Greenwell,* 20 Cal.App.2d 266 (66 P.2d 674) ; *People* v. *Seitz,* 100 Cal.App. 113 (279 P. 1070) ; *People* v. *Garnett,* 9 Cal.App. 194 (98 P. 247) ; *People* v. *Pembroke,* 6 Cal.App. 588 (92 P. 668)] hold that the testimony of a witness given at a former trial, and read at the instant trial, because of the nonavailability of the witness cannot be impeached by contradictory statements made subsequent to the former trial, or by statements made prior thereto but where the impeacher clearly shows that he had no knowledge of such contradictory statements, they are, and each of them is, overruled.''

Appellant contends that the trial judge and the district attorney were guilty of misconduct. He further contends that there were many other errors all of which are set out in his brief. From what has heretofore been set forth, it is apparent that a reversal is proper in this case and therefore we find it unnecessary to consider appellant's other contentions.

From the errors committed in this case, prejudice to the cause of the accused is so highly probable that we are not justified in assuming its nonexistence. We believe that the cumulative effect of all the errors was prejudicial and compels a reversal.

The judgment and the order denying motion for new trial are, and each is, reversed, and the cause remanded for a new trial.

White, P. J., and Doran, J., concurred.