[Crim. No. 12788.　Second Dist., Div. Five.　July 31, 1967.]

THE　PEOPLE, Plaintiff　and　Respondent,　v.　EDWIN
　　CHARLES　JAQUETTE et al., Defendants and Appel-
　　lants.

Herbert A. Moss, under appointment by the Court of Appeal, for Defendants and Appellants.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Thomas Kerrigan, Deputy Attorney General, for Plaintiff and Respondent.

FRAMPTON. J. pro tem.*—The defendants Edwin Charles Jaquette and Will Martin Jordan were jointly charged by information filed by the District Attorney of Los Angeles County with the crime of kidnaping in violation of section 207, Penal Code and with the crime of rape in violation of section 261, subdivision 4 of the Penal Code, both offenses having arisen out of the same event. Jaquette was charged with having suffered a previous conviction of robbery. Each entered a plea of not guilty and Jaquette denied the truth of the allegation of his prior conviction of felony. Upon trial before a jury the defendants were found guilty as charged. No disposition was made of the prior conviction of felony. Jaquette was sentenced to state prison, the terms to run concurrently. and Jordan was committed to the Youth Authority. Each appeals from the judgment.

## The Facts

Mrs. "C," 20 years of age, was employed as an outside waitress or "carhop" at Oscar's Drive-In, situated at 7040 Sepulveda Boulevard in the Van Nuys area of the City of Los Angeles. She had gone to work at about 7:30 p.m. on March 18, 1966, and continued to work until 3:30 a.m. the following morning. At about 2:30 a.m. on the 19th she observed the defendants on motorcycles on the north side of the building in an area reserved for customers who desired to be served while

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

seated in their automobiles. Both men had real thick beards and long hair. Jaquette wore a leather jacket and levis and Jordan wore a Mexican serape with a Maltese cross upon it and levis. Both pairs of levis had holes in them. "All their clothes were just filthy dirty." Mrs. "C" and a fellow waitress were each hesitant to wait on the defendants so they flipped a coin to decide the issue. Mrs. "C," having lost on the flip of the coin, went outside and told the defendants that she could not serve them inasmuch as it was not possible to place a serving tray upon a motorcycle, and suggested that they park their motorcycles in an area provided for customer parking and eat inside the restaurant. The defendants objected "loudly" and "strongly" to this arrangement. Mrs. "C" had never seen either of the defendants prior to this occasion. After a conversation with the cook of the establishment, she served the defendants with four hamburgers "to go," and they drove away on their motorcycles.

At about 3:30 or 3:45 a.m. on the 19th Mrs. "C," being through with her work, left through the back door of the restaurant to go to her car and drive home. At this time the defendant Jordan came out from beside a cigarette machine, poked what Mrs. "C" thought was a knife into her side and told her to get into his car. He stated, "You're coming with us." When Mrs. "C" started to say something, Jordan said, "Just get in the car." He then opened the car door and pushed the seat forward so that she could get into the rear seat of the vehicle. Mrs. "C" testified that he held this thing in her side which she thought was a knife, "he scared me to death," and she got into the rear seat of the vehicle, a 1963 two-door Chevrolet.

At this juncture of the proceedings the district attorney introduced into evidence, over the objection of the defendants, four photographs of Jaquette and four photographs of Jordan, which from the record appear to have been taken at the time of their booking some five to six hours after the time of the attack, and which fairly showed their appearance as of the time she (Mrs. "C") first observed them at the drive-in restaurant. These photographs were offered in evidence by the prosecution as having a bearing upon the question whether Mrs. "C" freely and voluntarily accompanied the defendants and thereafter voluntarily consented to the acts of sexual intercourse which took place.

Jordan got into the back seat of the vehicle with Mrs. "C" and Jaquette drove. She was told to place her purse on the

front seat, which she did. They proceeded south on Sepulveda Boulevard. Jordan indicated that he lived in the Venice area of the City of Los Angeles, and he and Jaquette talked about their motorcycles and the "Hells Angels." Jordan referred to himself as "Billy B," and Jaquette was called "Filthy." "They were mentioning funny names like filthy and dirty and names like that of their supposed friends in the Hells Angels." One of the defendants stated that "we were going to the Sepulveda Basin to get some marijuana they were growing there." Jaquette turned the car and went west on Victory Boulevard and then turned south on a dirt road and into the basin. They started counting poles as they drove in the basin until Jaquette finally stopped the car and got out, supposedly to get the marijuana that they were growing. There were no people or lights in this area, "just bushes and bushes." Mrs. "C" testified that she made no outcry from the time she left the drive-in until the car stopped in the Sepulveda Basin because there was no one about to call to; everything was closed at that hour in the morning.

After Jaquette left the vehicle, Jordan who had been making amorous advances toward Mrs. "C" during the drive proceeded to get rough with her. He pulled her real close to him, forced her to put her hands on his penis and bit her on the neck several times. She pushed him away. She was almost hysterical. "He told me to take off my clothes. He started to take off my clothes, and he told me unless I took them off—he was getting real rough, and I told him to leave me alone; and he said unless I took my clothes off, he would string my guts up on one of the poles out there." These statements frightened Mrs. "C"; she testified, "I was scared to death." Jordan then had an act of sexual intercourse with Mrs. "C" against her will. While this was taking place, Jaquette returned and got into the front seat of the vehicle. After Jordan finished his attack he got into the front seat and Jaquette got into the back seat of the vehicle at which time he pushed the victim's legs back over her head, inserted his hand into her rectum, then attempted an act of sodomy upon her. She screamed with pain. Jaquette then had an act of sexual intercourse with her. Eventually, the defendants drove her back to the restaurant parking lot, arriving there about 4:45 a.m. Mrs. "C" had not given her address or telephone number to either of the defendants. Because of her emotional state she had inadvertently left her white blouse, red scarf, sweater, and socks in the defendants' vehicle. Tags with the

name "Lynn" and the word "Trainee" were pinned to the blouse. At the parking lot, Jordan helped her to her automobile and told her to say nothing to anybody. After the defendants had left, Mrs. "C" searched in her purse to find money to make a telephone call and discovered that her wallet was missing. The wallet contained an identification card bearing her name, telephone number, and address upon it. She later received some of the items, which had been contained in the wallet, in a plain envelope in the mail. The police subsequently returned the wallet to her.

Before the defendants had left the parking lot, after they had driven Mrs. "C" there, one of the employees of the restaurant named Rudy drove through, saw Mrs. "C," and asked her why she had not gone home. Recalling Jordan's admonition to her not to say anything, she replied that she was going home then. She was fearful that the defendants would harm her if she said anything concerning the episode in their presence. It was her intention to call the police as soon as the defendants left. Mrs. "C" then drove to a nearby gasoline station where she telephoned to her boyfriend, Allen Seim. She made a complaint to Seim that the defendants had molested her. Seim came to the gasoline station and then accompanied Mrs. "C" to her home. Upon arrival at her home, at about 5:15 a.m., Mrs. "C" made a complaint to her mother that the defendants had molested her sexually. The mother communicated the complaint to Mrs. "C's" father, who then called the police.

Seim testified that he had received a telephone call from Mrs. "C" at about 4:45 on the morning of March 19. Mrs. "C" complained to him that she had been sexually molested. He met her at a telephone booth at Sherman Way and Sepulveda Boulevard. "[H]er hair was badly mussed, and her clothes were sort of hastily put on and badly wrinkled; and she was in a sort of a hysterical condition, sobbing and crying and barely able to talk. Just in very poor condition." They drove to her parents' home where she made a similar complaint to her mother. Her father then called the police. Officer McKean responded to the call.

Officer Loniero had issued a traffic citation to Jaquette at approximately 1:30 on the morning of the 19th near Sepulveda and Roscoe Boulevards. Jordan was with Jaquette at this time. Jaquette was riding a motorcycle and was wearing a black leather jacket, levis, and boots. He had long hair and a beard. Jordan also had a beard and long hair, and was wear-

ing a serape. Officer Loniero, having later received a want broadcast concerning the attack and having noted the similarity in the physical description given of the suspects and the two men he had seen earlier in connection with the traffic citation, checked his citation book for the address given by Jaquette and transmitted this information to Officer McKean who was then at the home of Mrs. "C."

When Officer McKean first observed Mrs. "C" at her home, she was lying on a couch on her stomach. She was sobbing and appeared to be in a state of shock. After Officer McKean received the message from Officer Loniero, he went to the address of Jaquette where he observed two motorcycles parked in front of the house, together with a 1963 Chevrolet automobile. He then returned to the home of Mrs. "C" and took her to the hospital. He then returned to the Jaquette residence where he met Officers Loniero and Funk.

When Officer Loniero received the want broadcast concerning the attack he went to the Jaquette address where he observed two motorcycles parked on the front lawn and a late model car parked in the driveway. He conveyed this information to Officer McKean. Later, Officer Loniero joined Officers McKean and Funk at the Jaquette residence. Upon return to the Jaquette residence the front door of the house was found to be unlocked and ajar. After knocking three times, Officer Funk pushed the door open and entered the living room. There he saw Jordan asleep on the couch. In a minute or two Jaquette and his wife came into the living room. Both defendants were placed under arrest at this time, and each was told that he had the right to an attorney, the right to remain silent, and that anything he said could be used against him. They appeared to understand this. At this time a key to the Chevrolet was handed to one of the officers by Jaquette's wife.

The statements which the defendants subsequently made were freely and voluntarily given.

Officer Loniero, after the arrest, talked with Jaquette in one of the police vehicles parked near the latter's home. In the meantime Officer McKean was searching the Chevrolet. Jaquette stated that he arrived home at about 3:30 or 4 a.m. on the 19th and went to bed. He denied seeing Mrs. "C" that morning. He added that he and Jordan had taken Jordan's girl friend, Nancy, to Venice and had returned home by way of the San Diego Freeway, getting off at Roscoe Boulevard and proceeding directly to his home. About ten minutes later,

after Officer McKean had found Mrs. ''C's'' identification tags, her scarf, and white blouse in the rear passenger area of the Chevrolet, Jaquette stated that he really had not taken Nancy home but that Jordan had done so in Jaquette's car. He said that he had remained at home the entire time and that he had given the prior account in the police vehicle because he knew his automobile was involved but he did not want to inform on Jordan.

Officer Funk talked with Jordan in a police vehicle in front of the Jaquette home within a few minutes after the arrest. Officer Funk advised Jordan of his right to an attorney, his right to remain silent, and that he did not have to tell him anything if he did not want to. Jordan appeared to understand this and his statements were freely and voluntarily given. When advised of his rights, Jordan said, ''This is a bum beef.'' Jordan stated that he had been with Jaquette on the evening of the incident and that they had had a few beers. At about 2:30 a.m., Jaquette drove Jordan's girl friend to her home in West Los Angeles. At first Jordan denied having seen Mrs. ''C.'' After Jordan had seen the items, worn by Mrs. ''C,'' removed from Jaquette's Chevrolet, he then told Officer Funk that he had been to the drive-in restaurant where Mrs. ''C'' had agreed to a date with him and had written her telephone number on an envelope and had given it to him. He then picked Mrs. ''C'' up later and they drove to the Sepulveda Basin, and while there he had an act of sexual intercourse with her. He maintained that he did not have a knife and that no force was used upon or against Mrs. ''C.'' He engaged in the sexual act because ''she started coming around strong.''

On March 21, Officer Long told the defendants that they were charged with kidnaping and rape, and advised them of their right to an attorney at any and all stages, of their right to remain silent, and that any statements which they made would be used against them in any subsequent criminal action. The defendants each acknowledged that he understood his rights. Thereafter each defendant made a statement in detail of his activities on the night of the 18th and the morning of the 19th. It would serve no useful purpose to set forth the details of these statements. The tenor of the statements was completely exculpatory of any wrongful conduct on their part, and if believed, disclosed that the act of Mrs. ''C'' in accompanying them to the Sepulveda Basin, and the acts of sexual intercourse which took place there were completely

voluntary acts on her part and were accomplished with her consent.

The leather jacket bearing a Maltese cross and a pair of levis with holes in them, worn by Jaquette at the time of the attack were received in evidence without objection at the trial.

Mrs. "C" testified, over objection, that after the first day of the trial, as the defendants were being taken from the courtroom, Jaquette turned his head toward her and made the following remark: "He said it with his teeth together, and he just kind of said, 'We'll get you, you bitch.'" She reported this immediately to the prosecutor.

### The Defense

Rudy Chavarria, a dishwasher at Oscar's Drive-In restaurant, saw a white Chevrolet in the parking lot of the restaurant at about 3:30 a.m. on March 19. Mrs. "C" told him that the men in the automobile were friends of hers and were going to take her home. Jordan approached and asked if a certain girl was ready to leave. Betsy Hart, a "carhop" employed at the restaurant, told Mrs. "C" that someone was waiting for her. Subsequently, Chavarria saw Mrs. "C" leave the building. One of the men opened the door of the Chevrolet and Mrs. "C" got into the rear seat of the vehicle. Chavarria did not see anyone stick an object into the side of Mrs. "C." As Chavarria was leaving the premises at 4 or 4:30 that morning he saw the Chevrolet again in the parking area of the restaurant. Mrs. "C" was standing outside the vehicle talking to Jordan. Chavarria, thinking that something might be wrong, asked Mrs. "C" why she did not go home. She told him, "Everything is okay." He did not see Mrs. "C" crying.

Betsy Hart recalled that two men came into the drive-in on motorcycles on March 19. She and Mrs. "C" had flipped a coin to determine which of them would wait on them. Mrs. "C" then waited on the two men. Earlier, Betsy Hart had asked Mrs. "C" if she would like a ride home, and Mrs. "C" said that she had her own car there at the restaurant. At about 3:15 that morning Betsy Hart told Mrs. "C" that some fellows were waiting for her in an automobile and that they wanted to know when she would be out. Mrs. "C" told her that she would leave in a few minutes. The cigarette machine at the side of the building was usually "rolled" inside so that it would not be stolen. On that evening Mrs. "C" left the restaurant building a few seconds before Miss Hart left. It was then about 3:30 a.m. and the cigarette

machine had already been rolled into the building by Chavarria. When Mrs. "C" left the building she walked some 20 feet unescorted to a white Chevrolet. One of the men got out of the vehicle and opened the door. Mrs. "C" then got into the vehicle. At no time did Miss Hart observe Jordan approach Mrs. "C" or place anything against her side. Mrs. Helene Hart, the mother of Betsy, testified that she drove to the restaurant at about 3:25 on the morning of March 19 to pick up her daughter. She saw Mrs. "C" leave the building and walk by herself to a white automobile in which two men were seated.

Both defendants testified at the trial. Each admitted to having had an act of sexual intercourse with Mrs. "C" but each testified that Mrs. "C" voluntarily submitted to such acts.

Joseph Drake, the bailiff who had escorted the defendants from the court room on the day that Mrs. "C" had testified that Jaquette had threatened her, testified that he did not hear Jaquette make any threats as they passed the witness stand.

### The Contentions

The defendants urge reversal upon the following grounds:

"I. The trial court erred by allowing the People to introduce photographs of the appellants.

"II. The trial court erred by allowing the People to introduce appellants' clothing.

"III. The trial court erred by allowing a witness to testify that during the trial she was threatened by one of the appellants.

"IV. The trial court erred by allowing non-experts to express opinions on medical matters.

"V. The totality of error constituted material error."

The photographs of the defendants were offered in evidence by the prosecution as bearing upon the material question whether the prosecutrix voluntarily accompanied the defendants to the location where the acts of intercourse took place, and whether she voluntarily submitted to such acts. The photographs depicted two young men wearing long hair and beards. The evidence also disclosed that they were riding motorcycles at the time they came to the drive-in restaurant. Their clothing was filthy and ragged. Their conversation indicated that they were in some way connected or associated with a group commonly known as "Hells Angels." Their long hair and beards, combined with their dress, was a proper subject

of scrutiny by the jury as having some bearing upon the question of consent of the prosecutrix. The photographs of the defendants illustrating their appearance and the clothing worn by them at the time of the incident were properly received in evidence as bearing upon this question. It is not sufficiently explained by the defendants why the totality of their appearance, voluntarily assumed by them, and considered by them and their associates as constituting a mark of distinction and status, should suddenly become marked with odium when placed in the scales of justice as having some bearing upon their guilt or innocence of the crimes charged. The defendants cite and rely upon *People* v. *Burns,* 109 Cal. App.2d 524 [241 P.2d 308, 242 P.2d 9], and *People* v. *Redston,* 139 Cal.App.2d 485 [293 P.2d 880], to sustain their claims of error that the admission of the photographs and clothing served no useful purpose and tended only to inflame the minds of the jurors. In both *Burns* and *Redston* the defendants were charged with murder and photographs of the victims' bodies, after the autopsy, were received in evidence. In *Burns,* the appellate court in commenting upon the photographs received in evidence, over the defendant's objection, said: ''They were pictures of the face, neck, and torso, taken after the autopsy. They were particularly horrible because the head was completely shaved. The head shows large incisions which had been made for the autopsy and were thereafter sewn together. In two pictures the lips were practically turned inside out and held with instruments to show the cuts. Both arms showed marks or punctures made by the surgeon, one being particularly ugly. Bruises and abrasions appear on the face, neck, and arms. Most of them are quite faint. No one disputed that the deceased received them. Defendant contended that they came from the falls and striking the objects on the beach. The prosecution claimed that they came from defendant's fists and hands. How looking at the pictures would help the jury understand what caused them or how they could cause death, it is difficult to understand. The completely bald head, the surgical cuts and sutures, the ugly punctures, the inverted lips with the instruments attached, make the body so grotesque and horrible that it is doubtful if the average juror could be persuaded to look at the pictures while the witness pointed out the bruises and abrasions. In view of the fact that no question was raised as to these bruises and abrasions, and the fact that a view of them was of no particular value to the jury, it is obvious that the only pur-

pose of exhibiting them was to inflame the jury's emotions against defendant." (*People* v. *Burns, supra,* p. 541.) A similar situation prevailed and a similar comment was made with respect to the photographs of the victim's body, received in evidence in the *Redston* case. (*People* v. *Redston, supra,* p. 490.) We find no parallel in the facts shown to have existed in the two foregoing homicide cases and those shown to exist in the case at bench. The trial court, under the facts and circumstances here shown, did not abuse its discretion in allowing the photographs and clothing in evidence. (*People* v. *Mathis,* 63 Cal.2d 416 [46 Cal.Rptr. 785, 406 P.2d 65]; *People* v. *Harrison,* 59 Cal.2d 622 [30 Cal.Rptr. 841, 381 P.2d 665].)

■ Jaquette urges that evidence of his having made a threat against the prosecutrix was immaterial to any issue in the case. The threat made by Jaquette was of such nature that it constituted an admission by conduct. (McCormick on Evidence, § 250, p. 536; McBaine, California Evidence Manual, § 943, p. 311; *People* v. *Parrella,* 158 Cal.App.2d 140, 149 [322 P.2d 83]; *People* v. *Weiss,* 50 Cal.2d 535, 554 [327 P.2d 527].)

■ Louis Largey, the father of Mrs. "C," testified, over objection, that when he saw his daughter on the morning of the 19th "Her physical condition was completely debilitated and she was in a state of shock." He testified further, "I think that Officer McKean described it quite accurately." Officer McKean had previously testified that when he first observed the prosecutrix in her home "she was laying on the couch, stomach down. She had a blanket over her, and she was sobbing; and she appeared to be in a state of shock." The defendants urge that the trial court committed reversible error in denying their motion to strike such testimony on the grounds that it constituted a medical conclusion expressed by a lay witness not qualified to express such a conclusion.

There are numerous definitions of the word shock, two of which are appropriate to the question raised here. In one instance shock is defined as "a sudden or violent disturbance in the mental or emotional faculties; a sense of outrage to ones convictions esp[ecially] of morality or propriety; something that causes outrage, horror, stupefaction, or disturbance or agitation in an institution, person, or organized system." (Webster's 3d New Int. Dict., unabridged, p. 2099, shock, 3a.) In the other instance shock is defined as "a state of profound depression of the vital processes of the body characterized by pallor, rapid but weak pulse, rapid and shallow

respiration, restlessness, anxiety or mental dullness, nausea or vomiting associated with reduced total blood volume and low blood pressure and subnormal temperature resulting from severe esp[ecially] crushing injuries, hemorrhage, burns, major surgery, or other causes.'' (Webster's, *supra,* shock, 4a.) From the foregoing definition, shock as it relates to a disturbance of the emotional faculties is something that can be observed readily from the appearance of a person and which can be understood and related by a lay person who observes the outward manifestations of the person suffering from that type of shock. The other type of shock is one which would be diagnosed by a medical doctor after examination of the patient. It is apparent from the record here that when the witness described Mrs. ''C's'' outward manifestations and testified that she appeared to be in a state of shock, they were referring to that type of shock which related to a disturbance of her emotional faculties and which could be readily observed from her appearance, and not to that type of shock which could be ascertained only by an examination of her conducted by a medical doctor. There was no error in the court's ruling denying the motion to strike this testimony.

There is substantial evidence in the record to sustain the jury's findings of guilty, and there are no errors upon which such findings should be set aside.

█ Penal Code section 654 provides in part that ''An act or omission which is made punishable in different ways by different provisions of this code may be punished under either of such provisions, but in no case can it be punished under more than one. . . .'' The record here discloses that the kidnaping was part of a continuous act motivated by one objective, rape. The kidnaping, although complete before the rapes were committed, were incidental to and a means of committing the rapes. (*People* v. *Nelson,* 233 Cal.App.2d 440, 446 [43 Cal.Rptr. 626].) Double punishment therefore is prohibited. (*People* v. *Failla,* 64 Cal.2d 560, 570 [51 Cal.Rptr. 103, 414 P.2d 39].)

The judgment and sentence to state prison, and the commitment to the Youth Authority, insofar as they impose sentences for kidnaping, are reversed. They are affirmed in all other respects.

Kaus. P. J., and Hufstedler, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied September 27, 1967.