[Crim. No. 6538. In Bank. Mar. 22, 1960.]

THE PEOPLE, Respondent, v. ALBERT ERNEST LOVE, Appellant.

Robert W. Anderson and Charles A. Skow, under appointment by the Supreme Court, for Appellant.

Stanley Mosk, Attorney General, and G. A. Strader, Deputy Attorney General, for Respondent.

TRAYNOR, J.—By information defendant was charged with the murder of his wife. He pleaded not guilty and not guilty by reason of insanity. A jury found him guilty of murder of the first degree but was unable to agree upon the penalty and was discharged. A second jury fixed the penalty at death and found that defendant was sane at the time of the homicide. Defendant successfully moved for a new trial on the ground of newly discovered evidence, and the order granting a new trial was affirmed by this court. (*People* v. *Love,* 51 Cal.2d 751 [336 P.2d 169].) At the second trial a jury again found defendant guilty of murder of the first degree, fixed the penalty at death, and found that he was sane at the time of the homicide. The trial court sentenced him to death. This appeal is automatic. (Pen. Code, § 1239, subd. (b).)

On the trial of the plea of not guilty defendant admitted shooting his wife but denied having any intent to harm her and denied that the shooting was deliberate or premeditated.

Defendant and the deceased were married on May 19, 1957. He was then 36 years old and on parole after a conviction of forcible rape. They had difficulties over finances, the care of Mrs. Love's 4-year-old son by a former marriage, and the disapproval of their marriage by her 17-year-old son. Late in February, 1958, defendant filed an action for divorce. Shortly thereafter Mrs. Love reported him for a violation of his parole, and he spent two weeks in jail. When he was released, she moved with her children to the house of a friend, Mrs. Nedra Darnell. Defendant went to live with his mother and stepfather.

On March 27, 1958, the day before the homicide, defendant went to a pawnbroker and traded his electric razor for a shotgun that he had formerly owned. His stepfather had said that he wanted a gun to protect his chickens from cats. Defendant took the gun home and placed it in the chicken house. He testified, however, that his real purpose in obtaining it was to have a means of committing suicide. He also purchased three shells and put them in the glove compartment of his car.

Mrs. Darnell testified that during the week before the homicide defendant visited her house repeatedly and that on such occasions he would urge his wife to return to him and she would say that she had not decided yet and needed time to think. Mrs. Darnell stated that on the day before the homicide she saw defendant speaking to his wife in front of the house and that Mrs. Love told her that defendant had made ''some more of his threats'' and had said that Mrs. Love ''better have [her] mind made up by noon tomorrow or else.''

Mrs. Darnell also testified that about 11 p. m. on the night before the homicide defendant came to her front door and demanded to see his wife. Mrs. Love turned on the porch light before going out to speak to him and he said, ''You didn't have to spotlight me. I haven't got anything with me. See, I am clean.''

Shortly after 8 a. m. on March 28th, the day of the homicide, defendant went to a gas station where Mrs. Love had recently given a bad check. He had previously begged the operator of the station not to prosecute her and had volunteered to work in payment of the check. Since it was raining and the work was outside, he was told not to work that day.

About 9:30 a. m. defendant visited Albert Blankenship, an accountant with whom Mrs. Love had left the books of a small trucking business that she and defendant had operated. Defendant said that he needed the books to prepare his tax return. Blankenship refused to give them to him without Mrs. Love's permission. At Blankenship's suggestion defendant went to get her permission, but returned an hour later saying that she refused to see him. Blankenship then gave him the books.

About 11:30 a. m. defendant visited the local office of the Welfare Department. He told his wife's case worker that he would like to support her 4-year-old son.

At noon defendant went home. His mother testified that during lunch he appeared to be very much upset and threatened to commit suicide. Shortly before 2 p. m. he drove her to the restaurant where she worked and said that he would be back later for coffee.

About 2:30 p. m. defendant went to his attorney's office ''to try to patch up [his] marriage.'' He met his wife there and testified that he asked her to return to him but that she refused and threatened to write his parole officer to revoke his parole. As he left he met Mrs. Darnell, who was waiting in a car for Mrs. Love, and said to her, ''What is Jean trying to

do to me?'' He then drove home, took the shotgun from the chicken house, loaded it, and put it in the front seat of his car. He testified that he intended to drive out into the country and commit suicide, but that he drove first to the house where he and Mrs. Love had lived together ''to go by one more time where I had been happy at.''

Mrs. Love left the attorney's office about 15 minutes after defendant and entered the car in which Mrs. Darnell and four children were waiting. On the way home, at Mrs. Love's suggestion, they drove to her former residence to see if any mail had come. As they were leaving, the car stalled and after several unsuccessful attempts to start it Mrs. Love decided to wait a while before trying again. During this period defendant drove by. Several minutes later he returned and asked if Mrs. Love wanted a push. She said, ''No,'' and he left. A few moments later he came by a third time and stopped his car on the opposite side of the street. The time was approximately 3:15 p. m. He called to Mrs. Love, ''Say, I want to get that fishing gear that's in the house.'' She shook her head. He called out, ''Oh, I can't, can't I,'' and crossed the street with the shotgun. As she said, ''Oh, no, Al,'' and then, ''Please don't do it, Al,'' he thrust the gun through the car window and fired one shot into the left side of her back at very close range. He said, ''All right, you lousy son of a bitching rat, you take that.''

Defendant ran back to his car and drove away. Shortly thereafter he appeared at the police station accompanied by his attorney. He told the officers that he had shot his wife, that they had been arguing about financial matters and the children, and that he should have shot himself but did not have the nerve. He mentioned that his wife had threatened to write his parole officer and said, ''Now, she will never be able to mail the letter.'' He also stated that he had held the gun close to her body so that the shot would not spread and injure the other occupants of the car.

Four psychiatrists testified as to defendant's mental condition. Dr. Bromberg characterized him as an emotionally sick individual who at the time of the homicide was in a distraught state ''brought about by virtue of his rejection feeling of humiliation and based upon a very unstable makeup.'' In Dr. Bromberg's opinion defendant's ability to premeditate was ''impaired.'' Dr. Green testified in answer to a hypothetical question that in his opinion defendant could and did

premeditate killing his wife and that his holding the gun close to her body to avoid injuring others indicates that he was thinking at the time. He also testified, however, that his tests revealed ''a self-protectively evasive, paranoid, impulse-ridden, extremely hostile, opportunistic, egocentric, emotionally explosive, schizoid psychopath, who is actively agitated in a ruminative, brooding, and self-centered fashion.'' Dr. Jackson testified that defendant had a sociopathic or psychopathic personality. He said, however, that defendant had the capacity to premeditate and that in his opinion, based on facts set forth in a hypothetical question, defendant did premeditate and form an intent to kill his wife. Dr. Almada agreed generally with Dr. Jackson and testified that he believed defendant did ''carry on a valuable kind of premeditation.''

Other evidence tended to show that defendant had a most unfavorable environment during his childhood and that as an adult he had repeatedly been in difficulties with women and with the law. He had little education and had been taught to drink and taken into houses of prostitution at a very early age by his father. He had three prior marriages, one to a girl of 14. He had prior convictions of statutory rape, grand larceny, and forcible rape. He had spent over half his adult life in jail.

Defendant contends that there was not sufficient evidence of premeditation and deliberation to support his conviction of murder of the first degree. He maintains that he hoped and planned for a reconciliation with his wife and that his acquisition of the gun on March 27th and his trip home to get the gun on March 28th can be explained as preparations for suicide. He argues that he had no reason to expect to find his wife at their former home and that in the light of the psychiatric testimony it is ''entirely reasonable'' to conclude that he killed her in an explosive emotional reaction to the last of a series of frustrations and rejections by her.

Defendant apparently assumes that this court should reverse his conviction if it can reasonably interpret the evidence in a manner consistent with his innocence. ▓▓▓ This assumption confuses the function of court and jury for it is the jury, not the court, that must be convinced of a defendant's guilt beyond a reasonable doubt. ▓▓▓ ''If the circumstances reasonably justify the verdict of the jury, the opinion of the reviewing court that those circumstances might also reason-

ably be reconciled with the innocence of the defendant will not warrant interference with the determination of the jury." (*People* v. *Huizenga,* 34 Cal.2d 669, 676 [213 P.2d 710]; *People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778].)

■ Although defendant evidently hoped for a reconciliation with his wife, the jury could infer that he also planned to kill her if she refused to be reconciled. Such an inference is supported by his acquisition of the shotgun and shells, his threat that she had better make up her mind by noon on March 28th "or else," the fact that he shot her at 3:15 p. m. on March 28th, the awareness of consequences that he displayed by holding the gun close to her body to avoid injuring others, the immediacy with which his trip home to get the gun and the shooting followed her refusal to return to him and her threat to write his parole officer, the absence of any subsequent substantial provocation for the killing, and the testimony of the psychiatrists as to his mental condition at the time of the killing. The jurors could reasonably have found the inference of premeditation compelling, particularly if they disbelieved defendant's testimony that he intended to commit suicide. They could also have concluded that he met his wife near their former home not by chance, but because he was driving about looking for her, visiting places where she was likely to be. The jury, therefore, could reasonably have been convinced beyond a reasonable doubt that defendant deliberated and premeditated killing his wife.

Defendant contends that the trial court erred in sustaining objections to certain questions of defense counsel during the *voir dire* examination of prospective jurors. ■ One such question was: ". . . assuming that you or some member of your family had been charged with a crime, would you be willing to have the matter heard by persons in your present frame of mind?" The trial court ruled that the question was not helpful or proper because a defendant would like to have his case heard only by persons in a frame of mind to find him innocent. Similar questions of prospective jurors have been permitted. (*People* v. *Bennett,* 79 Cal.App. 76, 92 [249 P. 20]; see *People* v. *Estorga,* 206 Cal. 81, 83 [273 P. 575].) We do not need to decide whether the trial court's ruling was erroneous, for it was clearly not prejudicial. Counsel was permitted to rephrase his question and obtain the information he sought in a different way.

■ The trial court also sustained objections to a series

of questions about the prospective jurors' understanding of the discretionary nature of the death penalty. Defendant's contention that these rulings were erroneous is without merit. The knowledge or ignorance of prospective jurors concerning questions of law is generally not a proper subject of inquiry on *voir dire*, for it is presumed that jurors will be adequately informed as to the applicable law by the instructions of the court. (*People* v. *Jefferson*, 84 Cal.App.2d 709, 711-712 [191 P.2d 487]; *People* v. *Harrington*, 138 Cal.App.2d Supp. 902, 904 [291 P.2d 584]; see *People* v. *Bryan*, 91 Cal.App. 189, 193 [266 P. 972].) Any suggestion in *People* v. *Bennett*, 79 Cal.App. 76, 88-93 [249 P. 20], that the parties must be permitted to question prospective jurors as to their understanding of "general principles of law" is inconsistent with the foregoing cases and is disapproved.[1]

Defendant contends that the trial court erred in admitting in evidence two 8″ x 10″ color photographs taken shortly after Mrs. Love's death showing her nude body on a hospital table. A hole approximately 4″ across appears in her back and quantities of blood appear on her back, the table, and the hands of the person holding her body.

■■ When allegedly gruesome photographs are presented, the trial court must decide whether their probative value outweighs their probable prejudicial effect. (*People* v. *Atchley, ante*, pp. 160, 168 [346 P.2d 764]; *People* v. *Brubaker, ante*, pp. 37, 48 [346 P.2d 8]; *People* v. *Carter*, 48 Cal.2d 737, 751 [312 P.2d 665]; *People* v. *Cheary*, 48 Cal.2d 301, 312 [309 P.2d 431].) ■■ The photographs in the present case were not exceptionally gruesome. (*Cf. People* v. *Redston*, 139 Cal.App.2d 485, 490-491 [293 P.2d 880]; *People* v. *Burns*, 109 Cal.App.2d 524, 541-542 [241 P.2d 308].) The position, nature, and shape of Mrs. Love's wound indicates that she was killed by a shotgun fired at very close range into her back from a point to her left. The photographs tend to prove how the shooting occurred and corroborate evidence that defendant intentionally held the gun close to his wife's body to avoid injuring others. Although this photographic

---

[1] Inquiry into a juror's understanding of a principle of law may, however, be a prerequisite to inquiry into his willingness to apply that principle of law. To preclude such inquiry might under some circumstances constitute a refusal to permit the "reasonable examination of prospective jurors" to which the parties are entitled. (See Pen. Code, § 1078; *cf. People* v. *Wein*, 50 Cal.2d 383, 394 [326 P.2d 457] [conscientious scruples against imposing death penalty]; *People* v. *Riser*, 47 Cal.2d 566, 575-576 [305 P.2d 1] [same].)

evidence was largely cumulative and might properly have been excluded, the trial court did not abuse its discretion in admitting it.

Defendant contends that the trial court erred in refusing to give certain requested instructions. Their substance was adequately covered, however, by other instructions that were given.

Defendant's remaining contentions relate to the penalty phase of the trial. He contends that the trial court erred in permitting the district attorney to read to the jury the following statement made by defendant during the penalty phase of his first trial: "Now, Ladies and Gentlemen of the jury, I ask that you take my life because I do not want to live. I am Catholic and the one mortal sin that I cannot commit against my God is suicide. I have no desire to live. I ask that you take my life with a clear conscience of knowing that you did the best thing and knowing that it is my wishes that you do so. That's all."

Defendant did not take the stand during the penalty phase of his second trial and contends that the reading of the foregoing statement violated his constitutional right not to be compelled to be a witness against himself. (See Cal. Const., art. I, § 13.) Defendant does not suggest, however, that his statement at the first trial was made under compulsion. ▮▮ If a person voluntarily gives evidence against himself, his constitutional rights are not infringed by the use of such evidence thereafter. (*People* v. *O'Bryan*, 165 Cal. 55, 61-62 [130 P. 1042].) ▮ Defendant's statement was relevant to the selection of penalty in that it indicated his evaluation of his conduct and his consciousness of guilt. The fact that his feelings had apparently changed since his first trial was a matter to be considered by the jury but did not render the evidence inadmissible.

▮ Defendant contends that the trial court erred in admitting testimony by Mrs. Darnell that during the summer of 1957 defendant attempted to borrow a 22-caliber pistol from her; that she said, "You know that you are not supposed to have a gun"; and that he admitted having other guns at home but said, "I need a small gun, one that I can put in a pocket, something that can't be seen." Defendant objected to this testimony on the ground that it concerned an incident too remote in time to be relevant. At separate proceedings on the issue of penalty, however, evidence may be presented "of

the defendant's background and history." (Pen. Code, § 190.1.) Other evidence established that as a condition of his parole defendant was forbidden to have firearms of any kind in his possession. Mrs. Darnell's testimony revealed both possession of such weapons and a violation of parole. Both matters were relevant to the selection of penalty.

Defendant contends that the district attorney committed prejudicial misconduct by referring to a recent trial that had allegedly received wide publicity in Butte County. During argument to the jury the district attorney said, "Jack Atchley is on death row now for murdering his wife." Defense counsel objected to this statement and the district attorney replied, "It's proper. It's in this very community in which this jury sits and it's not prejudicial and he murdered his wife and their verdict should be meaningful."

Although the jurors might properly consider uniformity of decision as a factor bearing upon the selection of penalty, knowledge merely of the result in the Atchley case could have been of little help to them. Neither the facts of that case nor the relevant background of defendant Atchley were before them. They could not evaluate whether uniformity of decision would be served by fixing the same penalty or a different penalty. Moreover, the district attorney's statement that the Atchley verdict should be meaningful improperly suggested that he was aware of similarities between that case and the present one. Although the trial court admonished the jury that the statements of counsel by way of argument are not facts in the case and told the district attorney to refrain from reference to any specific conviction, it did not expressly instruct the jury to disregard the reference to the Atchley case. Since other errors compel reversal, we need not determine whether that reference alone was prejudicial.

Over defendant's objection the trial court admitted in evidence on the issue of penalty a photograph showing a front view of the deceased lying on a hospital table. The photograph did not show her wound, but did show the expression of her face in death. Also over defendant's objection the court admitted a tape recording taken in the hospital emergency room shortly before Mrs. Love died. The recorded conversation dealt with the basic facts of the shooting, which had already been admitted by defendant and established at the trial of the plea of not guilty. The sole purpose of playing the recording, therefore, was to let the jury hear the failing voice and the

groans of the deceased as she was dying.[2] The playing of the recording was preceded by the testimony of a doctor who attended her that she was in extreme pain, that the shotgun blast had severely injured one of her kidneys, and that the pain caused by the passage of blood clots from the kidney into the bladder ''is probably in the uppermost types of severities of pain in clinical conditions that we see.'' The prosecution did not suggest that defendant intended to cause such pain or that he aimed the gun as he did for any reason other than to avoid injuring his wife's companions.

---

[2] The following transcript of the recorded conversation appears in the record:

Q. What happened? You say you were shot? A. Yes.

Q. Who shot you? A. My husband.

Q. When did this happen? A. (Victim groans.)

Q. Where? A. (Victim groans) downtown (victim groans).

Q. In the car? A. Uh-huh. (Victim groans.)

Q. You have reason to believe that you might not live? A. I don't know.

Q. You don't know? A. No.

Q. You say your husband shot you? A. Yes.

Q. While you were where? A. In the car.

Q. In the car? A. Uh-huh.

MR. MULKEY: Mrs. Love . . . A. Uh-huh.

Q. I'm with the District Attorney's office. A. Uh-huh.

Q. My name is Lloyd Mulkey. A. Yeah, I know.

Q. You understand you are (victim groans) very seriously hurt? A. Yes.

Q. And that you (victim groans) may possibly die? A. Yes.

Q. You understand that? A. Uh-huh.

Q. Everything you're (victim groans) telling me now are going to be (victim groans) the truth, Mrs. Love? A. Yes.

Q. Now you say your husband (victim groans) shot you, is that right? A. Yes.

Q. All right (victim groans). Did you (victim groans) have a (victim groans) fight with him (victim groans) before he shot you? A. Yes.

Q. Where were (victim groans) you shot? At your (victim groans) home? A. In the car.

Q. You were in the car? A. Yeah, uh-huh.

Q. Was he in the same car with you? A. No (victim groans), huh-uh. He was (victim groans) standing by the side of the walk.

Q. He was standing (victim groans) by the side of the walk (victim groans)? A. Uh-huh.

Q. And did you point any guns at him or anything of that kind? A. No.

Q. Did you (victim groans) give him any, any reason (victim groans) at all to think that you were going to hurt him (victim groans)? A. No.

Q. Did he say anything to (victim groans) you before he shot you? A. No. I don't remember.

Q. Do you remember whether he (victim groans) shot you with (victim groans) a pistol or a big gun? A. With a big one.

Q. It was a big one? A. Yeah.

Q. With a shotgun or a rifle, huh? A. Yeah.

Q. Uh-huh. And you hadn't threatened him with any gun or anything of that kind? A. No. (Victim groans.)

MR. MULKEY: Thank you, very much, Mrs. Love. (Victim groans.)

Defendant contends that the photograph and the tape recording served no purpose but to inflame the emotions of the jurors and that their admission in evidence was prejudicial error. The People contend that this evidence was admissible to demonstrate the enormity of the crime that defendant had committed.

Allegedly inflammatory evidence is admissible only when its probative value outweighs its prejudicial effect. (*Lehmuth* v. *Long Beach Unified School Dist.*, *ante*, pp. 544, 555 [348 P.2d 887] ; *People* v. *Carter*, 48 Cal.2d 737, 751 [312 P.2d 665] ; *People* v. *Cheary*, 48 Cal.2d 301, 312 [309 P.2d 431].) Since the jury has complete discretion to choose between the alternative penalties in the light of the objectives of criminal law (Pen. Code, §§ 190, 190.1; see Michael & Wechsler, Criminal Law and Its Administration 6-17), the permissible range of inquiry on the issue of penalty is necessarily broad. (*People* v. *Friend*, 47 Cal.2d 749, 767-768 [306 P.2d 463] ; *People* v. *Green*, 47 Cal.2d 209, 218-219 [302 P.2d 307].) The determination of penalty, however, like the determination of guilt, must be a rational decision. Evidence that serves primarily to inflame the passions of the jurors must therefore be excluded, and to insure that it is, the probative value and the inflammatory effect of proffered evidence must be carefully weighed.

The remoteness in time of the events being proved, the availability of less inflammatory methods of imparting to the jury the same or substantially the same information, and the bearing of the evidence on the several objectives of punishment are among the many factors to be considered. (See *People* v. *Friend*, 47 Cal.2d 749, 767-768 [306 P.2d 463] ; *People* v. *Brust*, 47 Cal.2d 776, 792 [306 P.2d 480].) In the present case it is clear that the challenged evidence had no significant probative value. Apart from matters admitted by defendant and established at the trial of guilt, the photograph and the tape recording tended to prove only that Mrs. Love died in unusual pain. Proof of such pain is of questionable importance to the selection of penalty unless it was intentionally inflicted.[3] Moreover, even if relevant and material,

[3]Pain unintentionally inflicted is relevant only to the extent that criminal penalties are designed to exact retribution for the evil done by criminals. Whatever may have been the fact historically, retribution is no longer considered the primary objective of the criminal law (*Williams* v. *New York*, 337 U.S. 241, 249 [69 S.Ct. 1079, 93 L.Ed 1337] ; *People* v. *Brust*, 47 Cal.2d 776, 791 n. 8 [306 P.2d 480]) and is thought by many not even to be a proper consideration (see M. R. Cohen, Law and the

Mrs. Love's pain was more than adequately described by the doctor. There was no need to show the jurors the expression of her face in death or to fill the courtroom with her groans. Both the photograph and the tape recording served primarily to inflame the passions of the jurors and both should have been excluded.

The prejudicial effect of this erroneously admitted evidence was aggravated by the district attorney's argument to the jury. He referred several times to the pain suffered by Mrs. Love and closed with an appeal for the death penalty, based primarily on the contents of the tape recording.

 In *People* v. *Linden*, 52 Cal.2d 1, 27 [338 P.2d 397], we pointed out that error tending to affect the jury's attitude in fixing the penalty "implicitly invites reversal in every case. Only under extraordinary circumstances can the constitutional provision save the verdict." In the Linden case the prosecuting attorney misstated the scope of appellate review of the jury's determination of penalty and thereby erroneously sought to minimize to the jury the finality of its decision. Even more prejudicial is the admission of evidence designed to appeal to the passion of the jury, for both the People and the defendant are entitled to have the jury fix the penalty dispassionately and rationally. We find no extraordinary circumstances that save the verdict in this case. Although defendant has a criminal record, has spent much of his life in jail, and at his first trial requested the death penalty (*cf. People* v. *Linden, supra*), there was substantial evidence that his antisocial behavior grew out of an unusually sordid childhood environment and reflected a highly unstable psychopathic personality. We cannot determine how the jury would have evaluated these and other considerations relevant to its determination of penalty had the photograph and tape recording not been erroneously before it. From a review of the entire record, however, we conclude that there exists "such an equal balance of reasonable probabilities as to leave the court in serious doubt as to whether the error has affected the result," and accordingly the error is prejudicial. (*People*

Social Order 310; Holmes, The Common Law 42, 46; Michael & Wechsler, *Criminal Law and Its Administration* 10-11). Granted, however, that retribution may be a proper consideration, it is doubtful that the penalty should be adjusted to the evil done without reference to the intent of the evildoer. Modern penology focusses on the criminal, not merely on the crime. (*Williams* v. *New York.* 337 U.S. 241, 247 [69 S.Ct. 1079, 93 L.Ed. 1337]; *People* v. *Friend*, 47 Cal.2d 749, 763 n. 7 [306 P.2d 463].)

v. *Watson,* 46 Cal.2d 818, 837 [299 P.2d 243]; *People* v. *Purvis,* 52 Cal.2d 871, 887 [346 P.2d 22].) The error did not, however, have any bearing on the jury's determination that defendant was guilty of murder of the first degree and its determination that he was sane at the time of the commission of the crime.

The judgment is affirmed as to the adjudication that defendant is guilty of murder of the first degree and was sane at the time of the commission of the offense. The judgment is reversed as to the imposition of the death penalty, and the cause is remanded for retrial and redetermination of the question of penalty only and for the pronouncement of a new sentence and judgment in accordance with such determination and the applicable law. (See *People* v. *Purvis,* 52 Cal.2d 871, 887 [346 P.2d 22]; *People* v. *Green,* 47 Cal.2d 209, 236 [302 P.2d 307].)

Gibson, C. J., Peters, J., White, J., and Dooling, J. pro tem.,* concurred.

McCOMB, J., Concurring and Dissenting.—I concur in the affirmance of the judgment (1) that defendant was guilty of murder of the first degree and (2) that he was sane at the time of the commission of the offense.

I dissent from the reversal of the judgment as to the imposition of the death penalty. I would affirm this portion of the judgment also, since I do not believe there was any prejudicial error committed by the trial court.

I do not believe it was error to admit (a) the photograph of the decedent showing a portion of her body, including her face, taken after her death, or (b) the tape recording of the decedent's dying declaration. The picture of the decedent was relevant for the purpose of showing the enormity of the crime which defendant had committed and the suffering of his victim and to indicate the nature of the punishment which should be administered to a defendant who had so callously and unremorsefully inflicted such cruelties. (See *People* v. *Friend,* 47 Cal.2d 749 [306 P.2d 463].)

The tape recording of the decedent's dying declaration was properly received to show the enormity of the crime and the circumstances of the offense. The condition of the victim, as indicated by her statement, was relevant to the jury's consideration of the proper punishment to be imposed.

---

*Assigned by Chairman of Judicial Council.

Penal Code section 190.1 specifically provides that upon the trial of the question of penalty evidence may be produced relating to the "circumstances surrounding the crime, of the defendant's background and history, and of any facts in aggravation or mitigation of the penalty." The members of the jury have an unqualified and unlimited discretion in fixing the penalty upon a conviction of first degree murder. As stated in *People* v. *Friend*, 47 Cal.2d 749, at pages 767-768 [306 P.2d 463] : ". . . the law does not itself prescribe, nor authorize the court to innovate, any rule circumscribing the exercise of their discretion, but, rather, commits the whole matter of its exercise to the judgment and the consciences of the jury; that in deciding the question whether the accused should be put to death or sentenced to imprisonment for life it is within their discretion alone to determine, each for himself, how far he will accord weight to the considerations of the several objectives of punishment, of the deterrence of crime, of the protection of society, of the desirability of stern retribution, or of sympathy or clemency, of age, sex, human passion, ignorance or weakness, or (if appropriate under the evidence, of illness or intoxication or provocation not sufficient to reduce the degree or class of the crime), of the presumptions concerning, or possible uncertainties attaching to, life imprisonment, or of the irrevocableness of an executed sentence of death, or an apprehension that explanatory facts may exist which have not been brought to light, or any other consideration whatever which in the light of the evidence, the duty they owe to the accused and to the state, and the law as explained to them by the judge, appears to them to be important."

The only valid purpose of separating the trials as to guilt and penalty would be to permit the production of evidence at the second hearing which should not be brought into the trial as to guilt. Otherwise the penalty issue might just as well be submitted on the evidence already produced. The court has held that the scope of inquiry and the factors which the jury may consider on the penalty issue are necessarily quite broad. (See *People* v. *Friend, supra*; *People* v. *Green*, 47 Cal.2d 209 [302 P.2d 307].) In *People* v. *Jones*, 52 Cal.2d 636, the court stated at page 647 [4] [343 P.2d 577] : "It would appear that the new section embodies the broad, liberal rule on admission of evidence that has always existed where a defendant has pleaded guilty and the only issues being tried relate to the degree of the crime and the penalty to be imposed.

In such cases wide leeway in the admission of evidence is permitted. (*People* v. *Green,* 47 Cal.2d 209, 236 [302 P.2d 307] ; *People* v. *Gilbert,* 22 Cal.2d 522, 528 [140 P.2d 9] ; *People* v. *Thomas,* 37 Cal.2d 74 [230 P.2d 351].)''

If the evidence offered might in any way assist the jury to resolve the question of whether the defendant deserves or would benefit from the giving of mercy, such evidence is relevant and material.

Schauer, J., concurred.