[Crim. No. 458. Fifth Dist. Aug. 5, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. DOROTHY JEAN ALLEN, Defendant and Appellant.

Edward V. Marouk, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Edsel W. Haws and Arnold O. Overoye, Deputy Attorneys General, for Plaintiff and Respondent.

THE COURT.—An information was filed in the Superior Court of Fresno County on December 22, 1966, charging Dorothy Jean Allen, Brenda Wilson and Diane Jackson with the murder of Joseph A. Reynaga. Two prior convictions, each of assault with a deadly weapon, were additionally charged against Dorothy Jean Allen. She was tried separately by a jury, found guilty of first degree murder, and was sentenced to prison for the rest of her natural life.

On January 6, 1967, the appellant was arraigned and admitted one of the prior convictions. She also made a motion under Penal Code section 995 to set aside the information. After the motion was denied, the appellant entered a plea of not guilty and at that time denied both prior convictions. On January 27, 1967, appellant requested and was granted leave to change her plea to guilty of second degree murder. A little later she asked that a new attorney be appointed for her; the request was granted and Edward V. Marouk of the Fresno Bar was named to represent her. She withdrew her plea of guilty to second degree murder on February 1, 1967, and instead entered a plea of not guilty. The court ordered that Derrill Millett of the Fresno Bar be appointed as a second attorney for the defendant.

The trial began on March 13, 1967; on the second day thereof appellant was permitted to amend her plea by admitting the first prior conviction of assault with a deadly weapon as alleged in the information; the second prior conviction was then dismissed on motion of the district attorney.

The facts proven, stated for the most part in the light most favorable to the respondent, are as follows: The body of the deceased, Joseph A. Reynaga, was discovered at approximately 6:30 in the morning on August 29, 1966, lying face up in the middle of Sacramento Street, near the "E" Street intersection, in the City of Fresno. The decedent had been

stabbed in the abdominal area with the wound penetrating the abdominal aorta; death was caused by the resulting shock and hemorrhage. The area where the body was found was desolate and uninhabited with most of the homes having been demolished as part of a redevelopment project.

The fatal wound penetrated Reynaga's body just below the belt line and measured 6 inches in length. The abdominal aorta was pierced at a point about 4 inches above the initial place of entry, and the wound was of such a nature that the possibility of suicide was not likely. Dr. C. D. Newel, who performed the autopsy, testified that the murder weapon was a knife, and that in his opinion the blade had to be at least 4 inches in length. Compresssion of body tissues in the area of the injury resulting from the force of the blow would make it possible for a 4-inch knife to cause a wound such as that suffered by the deceased. The autopsy surgeon also noted various abrasions on Reynaga's nose and face, which showed no evidence of healing and were probably incurred at or near the time of death.

The area adjacent to the victim's body was searched for weapons with no success. Reynaga's wallet was partially out of his left front pants pocket, and contained the pink slip to his automobile along with various miscellaneous papers. No money was recovered, however. Testimony at the trial would indicate that Reynaga had somewhere in the neighborhood of $20 in his possession at the time of his death. The only blood found at the scene was that directly under Reynaga's body.

Appellant and her friends, Brenda Wilson and Diane Jackson, were prostitutes and were actively pursuing their "profession" on the evening of August 28, 1966. At approximately 9:30 p.m., they were standing around Brenda's 1966 Ford Mustang, which was parked on "E" Street near Tulare. As Reynaga came down the street, appellant asked him if he would be interested in a date and he replied in the affirmative. Reynaga had been drinking that day, but appellant testified that he did not appear to be drunk. At the time of his death, however, Reynaga had a blood alcohol level of .17.

Reynaga was asked by appellant to produce some identification so that she could be sure he was not a police officer. She testified that this was something she always did to protect herself, and that it was not just a guise to see if a prospective customer had any money. When appellant was satisfied that Reynaga was a "safe trick," she asked Brenda to drive them

to a "trick house." Reynaga suggested that they go in his car, which was parked at a nearby cafe, but appellant refused claiming that she was new to Fresno and was afraid to go with him in a strange city. He then stated that he did not want to go to a "trick house," because he had gotten into trouble in a similar situation before. Instead, he said he knew of a place to go, whereupon he and the three girls got into Brenda's car and proceeded to the spot on Sacramento Street where his body was ultimately found. At one point on the trip, Brenda asked him if he would be interested in a double date. Reynaga said that he would and assured the girls that he had enough money to pay for it. The price was set at $10 for each girl.

Shortly after appellant was arrested she made a statement to Deputy District Attorney Donald Hazel, which was transcribed and read into the record as evidence at the trial. During the course of the conversation, appellant stated that she and her two companions had agreed to take Reynaga's money, and hoped to be able to scare him into giving up his money rather than having to turn a "trick." When the car was stopped on Sacramento Street, the occupants got out and the three girls were standing around Reynaga by the vehicle. All three girls were armed with knives at this point, but appellant claims that this was the way in which they protected themselves while working. Appellant had a grape knife, which had a curved blade about 3 inches long. Brenda's knife was similar to a hunting knife and had a blade approximately 4 inches long. Diane had a steak knife with a blade of about the same length. Appellant stated that when they got out of the car each of the girls had her knife "out." She contended, however, that the knives were concealed and not visible to Reynaga. Hers, for instance, was contained in a cigarette package with a kleenex tissue covering the handle. In any event, each girl had a knife in her hand, but appellant testified that she did not think Reynaga could see the knives. The autopsy surgeon testified that the fatal wound could not have been caused by a grape knife.

Appellant claims that after they got out of the car she asked Reynaga if he was going to date her first and he replied that he was. As she was getting back into the car to perform the act of prostitution, she saw Reynaga reaching down and thought, mistakenly, that he was going for a gun. She communicated this fear to her companions and they all started running. According to appellant, Reynaga chased Brenda and

when she fell she swung at him with her knife. Reynaga jumped back, and then proceeded to chase after appellant, who swung her knife at him cutting his pants behind the right knee. He continued to run at her, and, as a last resort, appellant hit him in the face with a greasy valve cover that had been lying on the ground nearby. Appellant claims that she and Brenda both lost their knives somewhere in the area that night. This would support the fact that the appellant apparently recovered the 4-inch blade weapon and thereafter used it on the victim.

After Reynaga was hit in the face with the valve cover, appellant contends Reynaga went over to Brenda's car, turned on the lights and began blowing the horn. The appellant says that he then slashed the headliner and seat covers with a knife, took a few steps backward, and fell to the ground. Appellant stated that she and her friends got into Brenda's car after Reynaga collapsed; she claims they did not touch the deceased. The women then went to the cafe near which Reynaga's car was parked and proceeded to search it, hoping to find money. That vehicle was subsequently found in a ransacked condition. Reynaga's brother testified that the deceased carried his car keys in his right pants pocket and was generally careful about locking his car. The keys to his car were not found on his body and were never recovered.

The prosecution introduced evidence that the decedent's pants had, indeed, been cut behind the right knee, and that a small amount of blood was found on the cut. This blood was said to have been picked up from the cutting instrument. Additionally, the pocket where decedent kept his car keys was ripped along the seam, and the inside was streaked with grease in a finger pattern. Appellant testified that she got grease on her hands from the valve cover which she used to hit the victim. It was further established that an analysis of the blood pattern on the pavement indicated that the deceased initially was on his side when he fell and was later rolled over on his back. This was the position in which the body was discovered.

The next day, Diane told appellant that Reynaga was dead, and appellant left for San Francisco shortly thereafter; she stayed in a hotel in San Francisco and visited her mother a number of times. On September 7, 1966, she was arrested by two San Francisco police officers and was returned to Fresno the next day.

Appellant raises the following issues as grounds for reversing the judgment of the Superior Court of Fresno County:

1. The confession of Dorothy Jean Allen was involuntary;

2. The evidence was insufficient to justify appellant's conviction of felony murder;

3. Misconduct by the prosecution and the court was so gross as to prevent appellant from having a fair trial.

I. THE STATEMENT OF THE DEFENDANT WITH RESPECT TO THE FACTS WAS VOLUNTARY AND PROPERLY ADMITTED IN EVIDENCE.

The first point which the appellant seeks to make is that her statements to the police were improperly admitted. She was first interrogated in the San Francisco jail by Lieutenant Orndoff and Sergeant Hirzel of the Fresno Police Department on the afternoon following her arrest, and a recording was made of the interview at that time. The tape containing the interrogation and her answers was heard by the trial judge in the absence of the jury, and, at first, by what appeared to be common consent, it was only marked for identification because the tape was not entirely clear in every part. However, before the close of the evidence it was offered by the defendant, was admitted, and was played to the jury. Surely no possible objection could be made to the tape covering the first interview in view of its introduction by the defense. It is clear that before the interrogation began appellant was informed of her various constitutional rights and signed the waiver card indicating her willingness to talk to the officers.

Late in the same afternoon the two Fresno Police Department officials, the defendant, and Benny Pace, who was her "common law husband" and initially was a suspect in the case, proceeded to Fresno in an automobile driven by one of the officers. They arrived there shortly after 9 p.m. and immediately thereafter she was interviewed by Deputy District Attorney Hazel.

It seems to us after carefully reading the briefs filed on behalf of the appellant prior to the oral argument that she did not initially claim any error under the authority of *Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]. However, in supplementary letter briefs filed after the oral argument the point is attempted to be made that under the *Miranda* line of cases, especially *People* v. *Fioritto,* 68 Cal.2d 714 [68 Cal.Rptr. 817, 441 P.2d 625], the appellant is entitled to a reversal. In the *Fioritto* case where a confession was admitted in evidence, the court reversed the judg-

ment of conviction on the ground that, in the circumstances of that litigation, the San Francisco Police Department should have promptly refused further interrogation of the defendant immediately after he indicated an insistence upon his right to remain silent. In the present instance, the facts are entirely different. The defendant was arrested in San Francisco for transportation to Fresno where the crime had been committed. Nothing was known of the detailed facts of the alleged murder by the San Francisco Police Department. While, according to the defendant, they did not then advise her of her rights or ask that she waive them, she herself admitted that they did not attempt to question her. Obviously, they were waiting for the right officers, men from the Fresno Police Department to come and get her and, if they saw fit, to question her upon arrival; the Fresno police did see fit to ask her questions and she willingly responded. She was advised of her rights by them under the *Miranda* case, and she said that she was fully acquainted with them through prior experience; the appellant signed a card acknowledging her full consciousness of her rights and waiving them. A little later, at Fresno, she willingly answered the questions of a deputy district attorney and acknowledged to the law enforcement officials that she stated her answers willingly and without pressure.

Appellant contends that various alleged promises and inducements made to her by Lieutenant Orndoff resulted in making her confession to Deputy District Attorney Hazel involuntary. She claims that Lieutenant Orndoff offered to help her with her parole on her previous conviction, and appellant's opening brief concludes that there are some facts which indicate she was telling the truth. As proof of this, appellant points to two questions in the taped San Francisco interrogation which made reference to the fact that she was on parole.

The case of *Lyter* v. *State*, 2 Md.App. 654 [236 A.2d 432], is cited by appellant as an example of an induced confession. There a police captain was said to have led a suspect to confess by assuring him that he would see what he could do for him if such a confession were given. In fact, the police officer went even further in that case by citing specific examples of people he had gotten off with light sentences when they had cooperated with him. The case was reversed because the state had failed to rebut completely certain statements that were alleged to have been made by the officer.

Moreover, it is contended that appellant was told to confess unless she wanted Benny Pace, her "common law hus-

band,'' to be involved. The actual statement was not that specific and only seemed to indicate that Pace might become involved if appellant's story was not straightened out. At this point Pace was actually considered a suspect in Reynaga's murder. Appellant refers us to *People* v. *Trout,* 54 Cal.2d 576, 585 [6 Cal.Rptr. 759, 354 P.2d 231, 80 A.L.R.2d 1418], wherein a confession was found to be involuntary because certain implied threats were made to the defendant that his wife would not be released from custody until he confessed to the crime.

The Attorney General points out that there is no problem in this case with respect to appellant's right to be admonished in accordance with the rules set out in *Miranda* v. *Arizona, supra,* 384 U.S. 436. On two occasions she was read her rights, and each time she indicated that she understood them and was willing to talk with the officers. ▮ It is noted that the issue of waiver is one for the trial court and will not be reviewed on appeal unless the trial court's determination was ''palpably erroneous.'' (*People* v. *Pierce,* 260 Cal.App.2d 852, 858 [67 Cal.Rptr. 438] ; *People* v. *Carter,* 258 Cal.App.2d 628, 634 [65 Cal.Rptr. 845].)

▮ The appellant, however, is also objecting to the confession as being inadmissible under ''traditional voluntariness standards.'' Respondent's position is that, even if this is the case, the question of voluntariness is still one of fact for the trial judge to determine. Here there was a conflict of evidence on the issue of voluntariness with the police officers testifying that no improper promises had been made, and appellant claiming she had been promised help with her parole and better treatment for her ''common law husband.''

▮ We held in *People* v. *Martinez,* 239 Cal.App.2d 161, 176 [48 Cal.Rptr. 521], that an appellate court cannot reweigh the evidence and reject the trial court's finding on credibility. In *People* v. *Dolan,* 38 Cal.App.2d 96, 98 [100 P.2d 791], a case relied on in *Martinez,* the court concluded that: ''There was thus a conflict of evidence as to whether the confessions had been freely and voluntarily made, the determination of which question lay in the sound discretion of the trial judge; and, being supported by substantial evidence, his finding that the confessions were not obtained by force or coercion is binding on this court.'' ▮ Here the *voir dire* examination on the issue of voluntariness was extensive, and the trial court concluded that the confession could be admitted.

At the end of the statement that was given to Deputy District Attorney Hazel, the appellant was specifically asked if she had made the statement voluntarily and whether she had been promised leniency if she cooperated. She stated that the answers were given voluntarily, and that no threats or promises had been made to her.

Appellant objects to what she terms various promises by Lieutenant Orndoff to help her with her parole, and the statement made regarding Benny Pace. The latter question was asked by Lieutenant Orndoff during the interrogation in San Francisco and is as follows: "Q. Now let me tell you what is going to happen. He [Benny Pace] has been close to this, he's your old man, there is a discussion about what to say to the police, so he's an accessory after the fact. We will probably make him take the stand and tell his part of what he knows about it what was involved in because that I don't know they might go on a conspiracy, they might go on an accessory so now he isn't wrong, now if he's got any brains and you don't want to involve him too much, why you two better on the way down to Fresno we better get this angle straightened out because he's going to testify whether he wants to or not." The question indicates that Pace was suspected of being involved in the crime, but there is no explicit statement that he would be exonerated if appellant confessed. The officer expressly denied that he ever said that Pace would be released if she cooperated.

There are only two instances in the record when Lieutenant Orndoff asked appellant about her parole. Both are on the tape made in San Francisco. At one point, Lieutenant Orndoff asked appellant how much parole time she had left, and another time he stated that he had no control over her parole and that it was up to the state. Appellant also claims that Lieutenant Orndoff said he would get the chief of police to write a letter to her parole board, but there is no evidence of such a statement ever being made. Lieutenant Orndoff testified that he had no discussion with appellant concerning her parole, and that he never offered to have a letter written to her parole board. He did state, however, that he knew she was on parole.

On the basis of the evidence given during the *voir dire* examination, it would appear that the trial judge justifiably concluded that the statement in question here was given voluntarily. This determination should not be disturbed on appeal.

## II. There Was Sufficient Evidence to Justify Appellant's Conviction of First Degree Murder.

In answer to appellant's next contention that there was insufficient evidence to convict her of first degree murder, there is evidence that the killing took place during the commission of a felony listed in Penal Code section 189. One theory of the prosecution was that appellant and her companions had formed the specific intent to rob Reynaga of his money, and that the murder was perpetrated during the commission of this felony, thus falling within the purview of Penal Code section 189. Emphasis is placed on *People* v. *Washington,* 62 Cal.2d 777 [44 Cal.Rptr. 442, 402 P.2d 130], wherein the court held that the felony-murder rule is only applicable when the killing is accomplished by the robber or his accomplice, and that a killing by a third person during the course of a robbery is not attributable to the robbers.

There was little evidence in the transcript, according to appellant, that she was the one who actually killed Reynaga. Therefore, she concludes that it was necessary for the prosecution to prove that there was a conspiracy to rob Reynaga, and that the killing was perpetrated during the commission of that robbery. It is pointed out that the term "robbery" was not used during appellant's interrogation in San Francisco, and that it was first employed by the deputy district attorney when the formal statement was taken in Fresno. During the interrogation, appellant stated that their plan was for one girl to have intercourse with Reynaga, and that while this was going on the others would take the money from his wallet. Mr. Hazel then asked, "You knew this would constitute robbery, didn't you?" Appellant answered in the affirmative. Counsel for appellant implies some form of misconduct on the part of the deputy district attorney, and speculates that the answer might have been different if the elements of a robbery had been defined.

It is also argued by appellant that even assuming that she did, in fact, intend to rob Reynaga, there was no showing that this intent was communicated to the other girls. She claims that their only discussion involved plans to commit petty theft and not robbery. Since she did not convey her intent to rob Reynaga, appellant's counsel claims that the killing appears to have been done by one of the other girls, and that the rule of *Washington* is applicable. Thus, he concludes her conviction under the felony-murder rule was improper.

Respondent notes that a murder committed in the course of

a robbery is first degree murder, and that the same is true when a murder is committed in an attempted robbery (*People* v. *Fortman*, 257 Cal.App.2d 45, 51 [64 Cal.Rptr. 669]). It takes the position that there was sufficient persuasive evidence before the jury for it to conclude that a robbery took place, and that the murder was committed by appellant pursuant thereto.

Appellant and her friends picked up the deceased for purposes of prostitution. All three of the girls agreed that they would take Reynaga's money. When they reached the scene of the crime, the parties got out of the car and at that time each of the girls was holding a knife. It may be inferred that some or all of the knives were visible to Reynaga. Appellant admitted that she intended to scare Reynaga into giving up his money, and that after they got out of the car they had him "a little worried." Appellant admitted cutting Reynaga's pants, and also striking him in the face with the valve cover.

Respondent believes that expert testimony refuted much of appellant's version of what actually happened. An expert in the analysis of blood patterns testified that Reynaga could not have remained standing long after receiving the fatal wound. This testimony tends to refute the statements of appellant that Reynaga chased her and the other girls around the area. She also claimed that he went over to Brenda's car and turned on the lights, blew the horn, and subsequently cut the headliner and seat covers. Assuming the fatal wound was received prior to this activity, it seems apparent that there would have been other blood patterns on the pavement and on Brenda's car. No blood, however, was found on the car. One reason for the experts' conclusion that Reynaga did not remain standing long after receiving the fatal wound was that there was no blood on the front of Reynaga's pants as would be expected if he had remained standing. The blood pattern on the ground also led the expert to conclude that the body had been moved prior to the time the right pocket was torn.

It is also contended that the evidence supports the inference that appellant did the killing herself. She admitted that she was the one responsible for the cut on his pants, and it was established that the blood found on that cut came from the cutting instrument. From this the jury could infer that she was responsible for the fatal wound. While an autopsy surgeon testified that a grape knife could not have caused the fatal wound, there was no testimony to corroborate appellant's statement that she was carrying such a knife. It is

possible that the jury disbelieved her testimony in that regard.

In summary, it would appear that the parties intended to take Reynaga's money by force or fear, and that he was killed by appellant during the furtherance of that plan. On this basis the evidence was sufficient to sustain the jury's verdict of first degree murder.

III. There Was No Prejudicial Misconduct on the Part of the Prosecution or the Court Which Would Warrant a Reversal.

■ The first act of misconduct alleged by appellant was the failure of the trial court to restrict respondent's *voir dire* examination of prospective jurors. It is contended that the prosecution was attempting to indoctrinate the jury on matters of law, and should have been restricted since that is an area that is within the province of the court (*People* v. *Love,* 53 Cal.2d 843, 852 [3 Cal.Rptr. 665, 350 P.2d 705]). Appellant claims that the constant repetition of the law prejudiced her in the eyes of the jury.

Specific exception is now taken to the examination of prospective juror McCurdy, part of which is set out in the reporter's transcript. While it is true that the prosecution was referring to certain principles of law, it would seem that the questions were more specifically directed to the issue of bias on the part of prospective jurors. These questions were being used preliminarily to determine the jurors' state of mind toward an applicable principle of law. It has been held that questions concerning principles of law may be asked of prospective jurors to determine if such jurors would follow them (*People* v. *Love, supra,* 53 Cal.2d 843, 852, fn. 1; *People* v. *Parker,* 235 Cal.App.2d 86, 98 [44 Cal.Rptr. 900]). This seems to have been what the prosecution was undertaking here, and it appears to us that no error resulted. These questions were not repeated to every juror, and in many cases were merely incorporated by reference.

■ At one point Sergeant Hirzel was being asked whether a certain photograph actually depicted that which it purported to be. It was a picture of the deceased's body lying in the street, and the defense was contending that the photograph was too dark. Appellant asserts that when darker areas of the picture were mentioned, Deputy District Attorney Pitts turned to the jury and said, ''Blood.'' This statement does not appear in the record, but was objected to by appellant's

attorney who claims to have overheard it. At that time the defense moved for a mistrial, but the motion was denied. Appellant now contends that this comment was prejudicial.

The picture at issue was never shown to the jury, and instead a new and lighter print made from the same negative was introduced as exhibit 9. Subsequent testimony established which spots were blood and which were grease. Appellant does not elucidate how she thinks she was prejudiced by this incident; in fact, it would appear that no prejudice resulted.

Appellant next refers to a series of remarks made by a deputy district attorney during the trial which are claimed to be prejudicial. They are as follows: the prosecution inferred that appellant's counsel was a wino; that some of appellant's evidence was so insignificant as to be of no matter; that a prosecution witness ''did not have decedent's hand with him to be a little gruesome about it''; that appellant was evading prosecution questions; and that appellant had been a prostitute for three years. None of these alleged improper statements was objected to by appellant's counsel during the trial. In her closing brief, appellant claims that repeated objections would have only alienated the jury.

The statements at issue here do not amount to prejudicial error.    As noted by respondent, failure to object and request an admonition to claimed acts of misconduct precludes consideration on appeal.    When the entire record is considered, it does not appear that the comments of the district attorney affected the eventual outcome (*People* v. *Beivelman,* 70 Cal.2d 60, 75 [73 Cal.Rptr. 521, 447 P.2d 913]).

Another objection raised by appellant is that during the trial certain photographs of the deceased were left on the prosecution table in full view of the jury. It is contended that this was done to influence their deliberations. The photographs were eventually given to the clerk at the request of appellant. All of the pictures were in evidence at the time, and the court directed that they be given to the clerk so as not to be misplaced. It does not appear that the placement of the photographs on the prosecution table was intentional and no prejudice could be said to have resulted.

As a final, and what appellant terms the most significant, objection, it is contended that the prosecution wrongfully described the girls' proposed conduct as robbery. This, of course, was one of the basic issues in the case. Appellant claims, however, that this attitude on the part of the prosecution had a misleading effect on the jury as the prosecution is

presumed to be trained in the law. Respondent's position is that since the issues were fully set out for the jury, and it was properly instructed by the court, no prejudicial error could have resulted. It further points out that any possible adverse effect on the jury was cleared up by defense counsel on *voir dire* of the jury and in closing arguments. Respondent, therefore, properly concludes that the jury was not misled and that the question of the district attorney was not prejudicial to appellant.

The judgment is affirmed.

Appellant's petition for a hearing by the Supreme Court was denied October 1, 1969.